## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOHN BENNETT, et al.,                    :
                                         :
                  Plaintiffs,            :    CIVIL ACTION
                                         :
        v.                               :    No. 09-cv-1819
                                         :
ITOCHU INTERNATIONAL, INC.,              :
et al.,                                  :
                                         :
                  Defendants.            :


## MEMORANDUM AND ORDER

**Joyner, J.**                                    **January 25, 2010**


        Before the Court is Defendants' Motion to Dismiss Amended
Complaint (Doc. No. 29), and responses thereto (Doc. Nos. 32,
34).  For the reasons set forth in this Memorandum, the Court
grants this Motion in part and denies in part.


## I. BACKGROUND[1]

        The parties in this case have a long history of negotiations
and agreements spanning the course of several years.  This case
revolves around several of the negotiations and agreements signed
between the parties during the last three years.  Plaintiff John
Bennett ("Bennett") was the Chief Executive Officer of Devon

---

[1] In line with a Fed. R. Civ. P 12(b)(6) Motion to Dismiss, all factual
allegations are viewed in the light most favorable to the non-moving party.
<u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (internal
citations omitted).

1

Robotics and the Chief Executive Officer of Devon Health during the relevant time period. Plaintiffs Devon Robotics and Devon Health Services ("Devon Health") are businesses involved in distributing various health care supplies. Defendants Itochu International ("Itochu") and MedSurg Specialty Devices ("MedSurg") are also involved in distribution of various medical supplies. MedSurg is a subsidiary of Itochu. Defendant Thomas Apple ("Apple") was Vice President, Corporate Counsel and Senior Advisor to the General Manager of Human Resources of Itochu during the relevant time period. Defendant Mounir Rabbat was Senior Vice President, Chief Operating Officer and General Manager of Business Development and/or a director of MedSurg during the relevant time period. Defendant Yoshihisa Suzuki was Chief Executive Officer and President of Itochu during all relevant time periods.

Health Robotics, S.r.L. ("HRSRL") is an Italian company that developed, designed, marketed and licensed robotic medication preparation products, including CytoCare and i.v.Station. On August 22, 2008, Devon Robotics entered into an agreement with HRSRL which provided them with exclusive distribution rights for i.v.Station in North America. On September 12, 2008, Devon Robotics also entered into the CytoCare Agreement with HRSRL for exclusive distribution rights for CytoCare in North America.

In August and September 2008, prior to entering the

i.v.Station and CytoCare agreements with HRSRL, Plaintiffs were involved in several negotiations with Defendants.  Rabbat advised Bennett that Itochu would partner with Devon Robotics in the distribution of both CytoCare and i.v.Station in consideration for its subsidiary, MedSurg, having distribution rights with respect to CytoCare.  Rabbat told Bennett that Itochu would share in the costs of research and development, licensing fees, and capital expenses associated with i.v.Station and CytoCare.  Additionally, the parties agreed that a new company would be formed to distribute the robots and that this company was to be owned jointly by Devon Robotics and Itochu.  Plaintiffs entered the i.v.Station and CytoCare agreements with HRSRL in reliance on these statements by Rabbat.

On November 5, 2008, Itochu entered a Line of Credit Agreement with Devon Robotics.  Pursuant to this agreement, Itochu provided a $4 million line of credit to fund Devon Robotics' operating expenses in distributing i.v.Station.  In exchange, Itochu received a call option that gave them the right to enter into a "50/50" distribution arrangement with Devon Robotics whereby Itochu would pay half of the fees already paid by Devon Robotics on i.v.Station and would forgive half the debt on the line of credit in exchange for fifty percent ownership of Devon Robotics.  The Line of Credit Agreement contains an integration clause which says, "This Agreement and the Notes

contain the entire agreement between the parties relating to the subject matter hereof and supersede all oral statements and prior writings with respect thereto." Additionally, Itochu issued a $5 million Letter of Credit in favor of HRSRL so that Devon Robotics could pay costs and licensing fees to HRSRL. However, ultimately, the parties never signed an agreement which would make Itochu a fifty percent partner in the distribution project with Devon Robotics and Itochu never paid any of the research and development costs, licensing fees, or capital expenses associated with the distribution of i.v.Station or CytoCare.

The parties also had several discussions regarding Itochu's potential investment in Devon Health Services. This investment would be made via payment to Bennett, the Chief Operating Officer and owner of Devon Health Services. Under the terms of this agreement Itochu would purchase fifty percent of the shares of Devon Health from Bennett for $27.5 million. While the parties were negotiating this agreement, they were also discussing a distribution agreement between MedSurg, Itochu's subsidiary, and Devon Robotics. Rabbat advised Bennett that Itochu did not want a distribution agreement between MedSurg and Devon Robotics to require MedSurg to sell any minimum number of robots. Rabbat and Suzuki told Bennett that in exchange for the removal of the minimum robot requirement in the MedSurg agreement, Itochu would close on the transaction in which Itochu would purchase fifty

percent of the shares of Devon Health from Bennett for $27.5 million. Suzuki advised Bennett that Bennett did not have to worry about the removal of the minimum quota from the Medsurg Distribution Agreement because Itochu would cover Devon Robotics financially should MedSurg fail to sell any robots. On November 5, 2008, Devon Robotics and MedSurg executed a distribution agreement ("MedSurg Distribution Agreement") which gave Medsurg the exclusive rights to distribute CytoCare robots and which did not require Medsurg to sell any minimum number of robots. Medsurg ultimately never sold any robots.

Following discussions on November 5, 2008, the parties signed a Term Sheet on November 11, 2008 regarding the deal in which Itochu would buy fifty percent of the shares of Devon Health from Bennett. The Term Sheet stated that the deal was to close on December 15, 2008 and that, "Nothing set forth herein shall give rise to binding obligations on the part of Purchaser. Binding obligations shall only arise through the execution of definitive agreements expressing a clear and express intention to be bound in accordance with the terms thereof."

Plaintiffs, in reliance on the agreements they had negotiated with Defendants, began to negotiate a deal with HRSRL. Under the terms of the Share Purchase Agreement, Devon Robotics agreed to pay HRSRL € 6 million for 13.33% of the shares in HRSRL. Bennett was planning on using the proceeds from Itochu's

purchase of Devon Health's shares for $27.5 million to fund Devon Robotics' purchase of shares in HRSRL. However, on December 10, 2008, five days before the closing of the Share Purchase Agreement between Devon Robotics and HRSRL, Rabbat informed Bennett that Itochu would not proceed with the transaction as outlined in the November 11, 2008 Term Sheet, even though Itochu was aware of the Share Purchase Agreement between Devon Robotics and HRSRL. As a result, Devon Robotics withdrew from the Share Purchase Agreement with HRSRL.

On December 15, 2008, Rabbat met with Bennett. Bennett told Rabbat that he wanted to proceed with the sale of Devon Health's shares under new terms so that Devon Robotics could enter into a new share purchase agreement with HRSRL. Itochu agreed to purchase 30% of the shares of Devon Health for $16,500,000. A second Term Sheet was executed between the parties on December 19, 2008, which provided that the deal would close no later than January 23, 2009.

Devon Robotics, in reliance on the December 19, 2008 Term Sheet, then entered into an Amended Share Purchase agreement with HRSRL in which Devon Robotics agreed to pay HRSRL € 12.5 million for 40% of the shares in HRSRL with a non-refundable deposit of € 5 million. Bennett later told Rabbat that Devon Robotics entered into an amended agreement with HRSRL and asked that Rabbat close the Itochu/Devon Health transaction so that Devon Robotics would

have the funds to complete its transaction with HRSRL.  Rabbat
stated that he would close the deal.  However, ultimately Itochu
and Devon Health never closed their deal and as a result Devon
Robotics was again unable to successfully close the deal with
HRSRL.

One of Plaintiffs' claims is also based on an interaction
outside of these negotiations.  In the spring of 2008, Rabbat
approached Bennett and suggested that they formalize the
relationship between Itochu and Bennett.  On June 26, 2008,
Rabbat suggested that Bennett take the title of "Executive
Advisor" to Itochu and Bennett agreed.  In this position, Bennett
was given the authorization to act on behalf of Itochu regarding
business opportunities in the health care field.  Then, on March
19, 2009, Defendant Apple wrote a letter in which he accused
Bennett of fraudulently misrepresenting that he was an agent of
Itochu and that Bennett was not and never had been an Executive
Advisor to Itochu.  Apple sent this letter to the general counsel
for HRSRL, Rabbat and the general counsel for Devon International
Group.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a complaint
should be dismissed if the plaintiff has failed to state a claim
on which relief can be granted.  In evaluating a motion to

dismiss, the court must take all well-pleaded factual allegations as true, but it is not required to blindly accept "a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 283 (1986); Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Although a plaintiff is not required to plead detailed factual allegations, the complaint must include enough facts to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Merely pleading facts consistent with liability is not sufficient; the plaintiff must plead facts which permit the court to make a reasonable inference that defendant is liable. Twombly, 550 U.S. at 570.

In evaluating a motion to dismiss, courts can consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and any undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on the document. Lum v. Bank of Am., 361 F.3d 217, 222 n. 3 (3d Cir. 2004); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). When the court considers documents outside of these, it generally must convert the motion to dismiss into a summary judgment motion. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). However, a court can consider a "'document integral to or explicitly relied upon in the

complaint.' " <u>Id.</u> (quoting <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1220 (1st Cir. 1996)). Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them. <u>Id.</u> The rationale for these exceptions is that "the primary problem raised by looking to documents outside the complaint-lack of notice to the plaintiff-is dissipated '[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint.' " <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 184 F.3d 280, 287 (3d Cir. 1999).

## III. Discussion

As a preliminary matter, Defendants argue that several agreements and letters following the negotiations among the parties preclude several of Plaintiffs claims. However, these documents are not properly before the Court at this time in deciding the motion to dismiss except for Count V, breach of duty to negotiate in good faith. When condsidering a motion to dismiss, courts can only consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and any undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on the document. <u>Lum v. Bank of Am.</u>, 361 F.3d at 222 n. 3; <u>Pension Benefit Guar. Corp.</u>, 998 F.2d at 1196. Although

Defendants attached these documents to their Motion to Dismiss and the documents are undisputedly authentic, none of Plaintiffs' claims, except the claim of breach of duty to negotiate in good faith, are based on the documents which Defendants claim preclude Plaintiffs' claims; therefore the documents cannot be considered by the Court at this time. While Plaintiffs did mention these documents in their Complaint, Plaintiffs' claims are in no way based on these documents. Therefore, the Court will not consider whether these agreements preclude Plaintiffs claims at this time, except with regard to Count V.

**A.  Count I - Defamation**

In Count I, Bennett alleges that Apple and Itochu defamed him in Apple's March 19, 2009 letter by stating that Bennett is not and has never been an Executive Advisor to Itochu. Defendants allege that Apple's statement was covered by an absolute privilege due to ongoing litigation in <u>Health Robotics v. Bennett</u>, 09-cv-0627.

Under Pennsylvania law, in order to establish a claim for defamation, plaintiff must allege the following elements: (1) a defamatory communication; (2) publication of the defamatory communication by the defendant; (3) the communication's application to the plaintiff; (4) an understanding by the reader or listener of the statement's defamatory meaning; and (5) an

understanding by the reader or listener that the statements refer to plaintiff.  Tucker v. Fishbein, 237 F.2d 275, 281 (3d Cir. 2001).  However, under Pennsylvania law, a publisher of defamatory material is not liable if the publication was made subject to a privilege and the privilege was not abused. Chicarella v. Passant, 494 A.2d 1109, 1112 (Pa. Super. Ct. 1985). The defendant bears the burden of showing the privileged nature of the communication.  42 Pa. Cons. Stat. Ann. § 8343(b).

Under Pennsylvania law, communications pertinent to any stage of a judicial proceeding are generally accorded an absolute privilege.  Binder v. Triangle Pubs., Inc., 275 A.2d 53, 56 (Pa. 1971).  This privilege extends to allow an attorney to advocate for a client under less formal circumstances.  Smith v. Griffiths, 476 A.2d 22, 25 (Pa. Super. Ct. 1984).  "The extent of a lawyer's privilege has been defined in the Restatement (Second) of Torts § 586 as follows: An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."  Id.  In order for a lawyer's communication to be entitled to immunity it is necessary that the communication have been pertinent and material to the redress sought in a suit and that the communication have been

issued in the regular course of the proceedings or that the protected communication was pertinent and material to a suit and would need to have been issued in the regular course of preparing for contemplated proceedings. <u>Post v. Mendel</u>, 507 A.2d 351, 356 (Pa. 1986). To permit an attorney to best serve a client, the privilege must also be broad enough to include occasions when a client's cause is being advocated under less formal circumstances as well. <u>Smith v. Griffiths</u>, 476 A.2d at 25.

Plaintiff's claim of defamation against Apple and Itochu must be dismissed. Although, as Plaintiff states in the response to the Motion to Dismiss, the scope of judicial privilege is not absolute, in Pennsylvania it has generally been a fairly broad grant immunity. Plaintiff claims that at the time the March 19, 2009, letter was written there was no litigation between the parties. However, there was ongoing litigation in a case in which nearly all the parties to this case were defendants or were contemplated defendants (<u>Health Robotics, et al., v. Bennett, et al.,</u> No. 09-cv-0627) and one of the key issues in that case is whether Bennett acted as an advisor to Itochu. The fact that this letter was also sent to the General Counsel of HRSRL does not destroy the privilege as numerous contracts between HRSRL and the various parties are at issue or play a key role in several related cases (Nos. 09-cv-0627, 09-cv-3552, 09-cv-4123). Apple's letter, therefore, was written during the course of litigation or

in contemplation of litigation and therefore is covered by the
broad grant of immunity given to lawyers under Pennsylvania law.
Finally, the letter was sent only to a group of people who were
intimately involved with the lawsuit, which is further proof of
the legal nature of the communication.  Therefore, Apple's
statements were protected under immunity and Count I must be
dismissed.

## B.  Count II - Breach of Contract

In Count II, Devon Robotics claims that Itochu and MedSurg
violated the November 5, 2008 MedSurg Distribution Agreement by
failing to pay marketing expenses, failing to use their best
efforts to promote CytoCare, failing to establish a sales team
and failing to pay the obligated amount for certain studies.
Defendants argue that the breach of contract claim against Itochu
should be dismissed because it was not a party to the MedSurg
Distribution Agreement.

Under Pennsylvania law, a principal is not automatically
liable for the acts of a subsidiary, even where the principal has
complete control of the subsidiary's stock.  Coll. Watercolor
Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 207 (Pa.
1976).  Liability only rises under traditional principles of
agency or an alter ego, veil piercing analysis.  Zubik v. Zubik,
384 F.2d 267, 273 (3d Cir. 1967).  Under Pennsylvania law, the

basic elements of an agency relationship are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.  Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000).  Additionally, an agent is not personally liable for contracts that it enters on behalf of a disclosed principal.  Id.  In this case, since MedSurg would be considered a disclosed principal, Devon Robotics would have to rely on a different theory to establish Itochu's liability.

In Pennsylvania there is a strong presumption against piercing the corporate veil.  Wedner v. Unemployment Compensation Bd. Of Review, 296 A.2d 792, 794 (Pa. 1972); Zubik v. Zubik, 384 F.2d 267, 273 (Pa. 1967).  Pennsylvania courts consider the following factors in determining whether to pierce the corporate veil: (1) insufficient capitalization; (2) intermingling of funds; (3) other officers and directors not functioning; (4) failure to observe corporate formalities; (5) failure to pay dividends.  See Village at Camelback Property Owners Assn. Inc. v. Carr, 538 A.2d 528, 535 (Pa. Super. Ct. 1988).

Itochu is not a party to the MedSurg Distribution agreement. Even though MedSurg is Itochu's subsidiary, Itochu is not automatically liable for the acts of MedSurg.  Therefore, Itochu can only be liable under an alter-ego or veil-piercing analysis.

Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967).

Plaintiffs have adequately established that Itochu could be liable for MedSurg's breach of the MedSurg Distribution Agreement under an alter ego theory. Plaintiffs alleged that Itochu exercised complete dominion and control over Medsurg with respect to the negotiations and execution of the Medsurg Distribution Agreement. Plaintiffs also identify specific individuals and actions taken by those individuals at specific times to support their conclusion. These allegations are sufficient to withstand Defendant's Motion to Dismiss.

Defendants also argue that certain inconsistencies in the Complaint show that Plaintiffs claims should be dismissed. However, Plaintiffs have sufficiently stated a claim for breach of contract and a motion to dismiss is not the proper time for the Court to inquire into the merits of Plaintiffs' claim; therefore Defendants' Motion to Dismiss Count II is denied.

## C.  Count III - Fraudulent Misrepresentation

In Count III, Plaintiffs allege a claim of fraudulent misrepresentation against Itochu, Rabbat and Suzuki.  Plaintiffs claim that Rabbat represented that Itochu would enter into an agreement with Devon Robotics in which Itochu would become a fifty percent partner and investor in a business that would distribute i.v.Station, but that these were in fact false

representations.  Plaintiffs allege that Rabat knew or reasonably should have known that the statement he made regarding the potential deal was false.  Bennett and Devon Robotics claim that in reliance on this statement they entered into an agreement with HRSRL which obligated them to pay all of the research and development expenses with respect to i.v.Station.

Plaintiffs also allege that the same situation occurred with regard to the sale of CytoCare.  Rabbat again advised Bennett that Itochu would enter an agreement with Devon Robotics whereby Itochu would be a fifty percent partner with respect to the sale of CytoCare.  Plaintiffs entered an agreement with HRSRL for the distribution of CytoCare based on Rabbat's representations. However, Itochu again failed to follow through on the agreement. Bennett and Devon Robotics claim that in reliance on this statement they entered into an agreement with HRSRL which obligated them to pay all of the research and development expenses with respect to CytoCare.

Finally, Plaintiffs allege that Rabbat told Bennett that Itochu would purchase fifty percent of the shares of Devon Health from Bennett in exchange for the removal of any binding quotas or minimum purchase obligations from the MedSurg Distribution Agreement.  Suzuki also told Bennett that Itochu had substantial financial resources and therefore, Devon Robotics would suffer no loss if the quotas were removed from the MedSurg Distribution

Agreement.  In reliance on these statements, Devon Robotics
removed the binding quotas and minimum purchase obligations from
the MedSurg Distribution Agreement.  However, Itochu never
purchased any shares of Devon Health's stock.  Plaintiffs allege
that Rabbat and Suzuki's statements on November 5, 2008 were
false representations of material facts and that they knew or
should have known of the falsity of their statements.  In
reliance on these statements, Bennett and Devon Robotics entered
into the Share Purchase Agreement with HRSRL.  Because Itochu
never purchased the shares of Devon Health, Bennett and Devon
Robotics were unable to finalize the Share Purchase Agreement
with HRSRL.

To establish a fraudulent misrepresentation claim, a
plaintiff must allege (1) a misrepresentation, (2) a fraudulent
utterance thereof, (3) an intention by the maker that the
recipient will thereby be induced to act, (4) justifiable
reliance by the recipient upon the misrepresentation and (5)
damage to the recipient as a proximate cause.  <u>Petruska v. Gannon
Univ.</u>, 462 F. 3d 294, 310 (3d Cir. 2006).  The recipient of an
allegedly fraudulent misrepresentation is under no duty to
investigate its falsity in order to justifiably rely.  <u>Toy v.
Metropolitan Life Ins. Co.</u>, 928 A.2d 186, 207 (Pa. 2007) (citing
<u>Merritz v. Circelli</u>, 64 A.2d 796, 798 (Pa. 1949)).

However, in general, under Pennsylvania law, promises to do

future acts do not constitute a valid fraud claim. <u>Mellon Bank</u>
<u>Corp. v. First Union Real Estate Equity and Mortg.</u>, 951 F.2d
1399, 1409 (3d Cir. 1991) (internal citations omitted). In <u>Melon</u>
<u>Bank</u>, the Court noted that First Union's oral promise not to
prepay or to protect Mellon in the event of prepayment was a
promise to do or refrain from doing something in the future.
Mellon argued, however, that at the time First Union made its
promise to Mellon, it had no intention of performing its promise.
The Court held that while a cause of action for fraud must allege
misrepresentation of a past or present material fact, a statement
of present intention which is false when uttered may constitute a
fraudulent misrepresentation of fact. <u>Id.</u> at 1410 (citing
<u>Nissenbaum v. Farley</u>, 110 A.2d 230, 233 (Pa. 1955); <u>College</u>
<u>Watercolor Group, Inc. v. William H. Newbauer, Inc.</u>, 360 A.2d
200, 206 (Pa. 1976); <u>Fidelity-Philadelphia Trust Co. v. Simpson</u>,
143 A. 202, 204 (Pa. 1928)). However, non-performance does not
by itself prove a lack of present intent. <u>Id.</u> (citing <u>Fidurski v.</u>
<u>Hammill</u>, 195 A. 3, 4 (Pa. 1937); <u>McCreary v. Edwards</u>, 172 A. 166,
167-68 (Pa. 1934)).

Additionally, under Federal Rule of Civil Procedure 9(b),
pleadings alleging fraud must, "state with particularity the
circumstances constituting fraud or mistake." Fed. R. Civ. P.
9(b). Rule 9(b) requires the plaintiff to go beyond the minimal
pleading requirements of Federal Rule of Civil Procedure 8(a)

18

when pleading fraud.  However, "malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Id.  The Third Circuit Court of Appeals has interpreted Rule 9(b) to require the plaintiff to plead either the date, place or time of the fraud or through alternative means give precision and some measure of substantiation to its allegations of fraud.  Lum v. Bank of America, 361 F.3d 217, 224 (3d Cir. 2004).

Plaintiffs have sufficiently pled a claim of fraudulent misrepresentation.  Plaintiffs have adhered to the requirements of Federal Rule of Civil Procedure 9(b) and pled with specificity the circumstances constituting fraud.  Plaintiffs offer specific dates of when the misrepresentations occurred (e.g. November 5, 2008), by whom and to whom they were made (e.g. by Rabbat to Bennett), and the circumstances surrounding those statements. Additionally, in each situation in which they alleged that a fraudulent misrepresentation was made, they have alleged an intention by the maker that the recipient was to be induced to act, justifiable reliance, and damage.[2]

Finally, although Plaintiffs' claim is based on a promise to do a future act and these types of promises generally do not constitute a fact which is sufficient to base a claim of

_____

[2] Since the Court is not considering the various agreements which were executed between the parties at this time, the Court makes no determination as to whether the language in those agreements undermine Plaintiffs' argument that they reasonably relied on Defendants' statements.

fraudulent misrepresentation upon, here Plaintiffs have alleged that Defendants made the statement knowing that they would never follow through with their agreement. Since Plaintiffs have alleged that Defendants' statements were false at the time they were made, those statements regarding future events are sufficient for a claim of fraudulent misrepresentation. Therefore, Defendants' Motion to Dismiss Count III is denied.

## D.  Count IV - Negligent misrepresentation

In Count IV, Plaintiffs allege that even if the statements made by Rabbat and Suzuki (see Section C. <u>supra</u>) were not fraudulent, they were negligent misrepresentations of fact.

Negligent misrepresentation requires proof of (1) a misrepresentation of a material *fact*; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. <u>Bortz v. Noon</u>, 729 A.2d 555, 560 (Pa. 1999). Negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words. <u>Gibbs v. Ernst</u>, 647 A.2d 882, 891 (Pa. 1994).

Like with fraudulent misrepresentation, negligent

misrepresentation requires a negligent statement regarding a present, material fact.  Bortz v. Noon, 729 A.2d at 560; Charleswell v. Chase Manhattan Bank, N.A., 308 F. Supp. 2d 545, 568 (D.V.I. 2004).  However, in a claim for fraudulent misrepresentation, a statement of opinion or future fact can be the basis for a fraudulent misrepresentation claim if it is shown that the statement was false at the time it was made.  See supra Section F.  However, the same logic cannot be applied to a claim of negligent misrepresentation.  At the time that a statement is made regarding what the speaker intends to do in the future, the speaker either intends at the moment to take the action he is promising or not.  The speaker cannot be negligent as to his future intentions.  Therefore, for a claim of negligent misrepresentation there is no exception to the rule that a misrepresentation must be of a present fact and not a future intention like there is with a claim of fraudulent misrepresentation.  See Charleswell, 308 F. Supp. 2d at 568; Addie v. Kjaer, 2009 WL 453352 (D.V.I. 2009); Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20-21 (2d Cir. 2000).  "This is not some obscure technical rule.  It is a natural consequence of the meanings of the terms negligent and misrepresentation.  A misrepresentation conveys "false information; that is, it must be a false statement of fact.  But a promise in itself contains no assertion of fact other than the

implied representation that the speaker intends to perform the promise.  The misrepresentation must therefore be that the promissor is falsely declaring that he has the intent to perform. If the promissor intends not to perform, however, the misrepresentation (that the promissor intends to perform) is not negligent; it is, rather, knowing and intentional."  <u>Addie v. Kjaer</u>, 2009 WL 453352 (D.V.I. 2009).

In this case Rabbat and Suzuki made affirmative representations to Bennett regarding their intentions to enter certain future agreements.  These statements were either true at the time they were made or they were not.  Either Rabbat and Suzuki intended to hold up their end of the agreement, in which case their statements would not be negligent; or they did not intend to close the deals, in which case their statements would constitute fraudulent misrepresentations.  In either case, the statements can not be considered to be negligent.  Therefore, Count IV of Plaintiffs' Complaint must be dismissed.


**E.  Count V - Breach of Duty to Negotiate in Good Faith**

In Count V, Plaintiffs allege a breach of the duty to negotiate in good faith by Defendants.  Plaintiffs allege that Defendants violated their duty to negotiate in good faith by inducing Devon Robotics to enter into agreements with HRSRL regarding i.v.Station and CytoCare and then failing to uphold

their agreement to share in the expenses associated with the technology. Plaintiffs also allege that Defendants breached their duty to Plaintiffs by assuring Plaintiffs that the MedSurg Distribution Agreement did not require any minimum quotas and that Itochu would stand behind Plaintiffs financially even if MedSurg never sold any robots. Finally, Plaintiffs allege that Defendants violated their duty to negotiate in good faith by failing to close the deal in which Itochu would purchase fifty percent of the shares of Devon Health.

A duty to negotiate in good faith requires a binding agreement between the parties expressing their commitment to negotiate together in good faith to reach a final agreement. Channel Home Ctrs.,Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986). A cause of action for breach of duty to negotiate in good faith requires the plaintiff to show that: (1) both parties manifested an intention to be bound by an agreement to negotiate in good faith; (2) the terms of the agreement are sufficiently definite to be enforced; and (3) consideration was conferred. Flight Sys., Inc. v. Elec. Data Sys. Corp., 112 F.3d 124, 130 (3d Cir. 1997).

Plaintiffs have sufficiently stated a claim for breach of duty to negotiate in good faith. Plaintiffs' claim of breach of duty to negotiate in good faith, unlike their other claims, relies on the "various letters of intent and terms sheets

negotiated at length among the parties." Therefore, the Court
will look, in part, to the terms of these agreements in order to
determine whether this cause of action may stand.

The November 11, 2008 Term Sheet was signed after the
parties' negotiations on November 5, 2008. The Term Sheet stated
in part, "Nothing set forth herein shall give rise to binding
obligations on the part of Purchaser. Binding obligations shall
only arise thorough the execution of definitive agreements
expressing a clear and express intention to be bound in
accordance with the terms thereof." Paragraph 9. The other term
sheets and letters of intent on which Plaintiffs base this claim
contain similar language.

However, this language is not definitive proof that a duty
to negotiate in good faith did not arise. See Channel Home
Centers v. Grossman, 795 F.2d at 298 (noting that a non-binding
letter of intent is sufficient to give rise to a duty to
negotiate in good faith). In determining whether a letter of
intent is sufficient to give rise to a duty to negotiate in good
faith, we must examine the entire document and the relevant
circumstances surrounding its adoption. Id. (citing Refining Co.
v. Jenkins, 189 A.2d 574, 580 (Pa. 1963); Hillbrook Apartments,
Inc. v. Nyce Crete Co., 352 A.2d 148, 151 (Pa. 1975)). In this
case, the December 19, 2008 Term Sheet stated that Itochu and
Devon Robotics agreed to, "undertake firm and committed effort to

close the transaction no later than 01/23/2009." Additionally,
Devon agreed to remove the minimum quotas in the November 5, 2008
Medsurg Distribution Agreement in exchange for this agreement.
Both parties received a benefit from this agreement. There being
evidence that value passed from each party to the other, we
conclude that the record would support a finding that Plaintiffs'
execution of the Term Sheet conferred a bargained for benefit on
Defendants (*i.e.* the removal of the quotas from the MedSurg
Distribution Agreement) which was valid consideration for
Defendants' return promise to negotiate in good faith.
Therefore, Defendants' Motion to Dismiss Count V is denied.


**F.   Count VI and VII - Breach of Oral Contract**

In Count VI, Bennett and Devon Health allege breach of
contract against Itochu. Plaintiffs argue that the statements of
Rabbat and Suzuki on November 5, 2008 on behalf of Itochu in
which they agreed to purchase fifty percent of the shares of
Devon Health from Bennett for $27.5 million was an oral contract.
They also argue that Rabbat's statements on December 15, 2008 in
which Rabbat again agreed that Itochu would purchase shares of
Devon Health was also an oral contract. Both of those promises
were made in exchange for the removal of the minimum quotas in
the November 5, 2008 MedSurg Distribution Agreement. Itochu
never followed through on its promise to purchase the shares from

Devon Health.

In Count VII, Bennett and Devon Robotics allege a breach of oral contract claim against Itochu.  Plaintiffs' claim is based on the oral agreement that was entered with Itochu in which Itochu promised to be a "50/50" partner and investor with Devon Robotics with respect to CytoCare and i.v.Station and share in all research and development fees, licensing fees and capital expenses in exchange for MedSurg having distribution rights with respect to CytoCare.  Itochu never provided Plaintiffs with the funding it promised.  Plaintiffs claim that Defendants breaches caused them substantial financial loss.

Under Pennsylvania law, an action for breach of contract requires a showing of: (1) a valid and binding contract; (2) the essential terms of the contract; (3) defendant's breach of a duty imposed by the contract; and (4) damages resulting from that breach.  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  In determining whether the first of these elements is met courts examine whether: (1) both parties manifested an intention to be bound; (2) the terms of the agreement are sufficiently definite to be enforced; and (3) there was consideration.  ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 666 (3d Cir. 1998) (citing Johnston the Florist, Inc. v. TEDCO Constr. Corp., 657 A.2d 511, 516 (Pa.

1995)).

Plaintiffs have sufficiently stated claims for breach of oral contract. The details regarding the conversations between Bennett, Rabbat, and Suzuki which took place between August and December 2008 are sufficiently definite to show valid oral contracts, the essential terms of the contracts, Defendants' breaches, and the resulting damage from those breaches. Plaintiffs have in each Count identified the subject matter of the contract, the price, and the time of performance. This level of detail is sufficient to withstand a motion to dismiss.[3] Therefore, Defendants' Motion to Dismiss Counts VI and VII is denied.

## G.  Counts VIII and XI - Promissory Estoppel

In Count VIII, Bennett and Devon Health assert a claim of promissory estoppel against Itochu based on Itochu's promise on November 5, 2008 that it would purchase fifty percent of the shares of Devon Health for $27.5 million in consideration of Devon Robotics agreeing to remove the minimum quotas from the Medsurg Distribution Agreement. They also base their claim on Itochu's promise on December 15, 2008 that Itochu would purchase

---

[3] Again, we note that since various term sheets, letters, written agreements, etc. between the parties are not before the Court at this time, the Court makes no determination as to whether the language in those agreements provide a valid defense to Plaintiffs' claims of breach of oral contract.

thirty percent of the shares of Devon Health for $16.5 million with an option to purchase an additional twenty percent of the shares. Bennett and Devon Health claim that they reasonably relied on the promises of Itochu and borrowed funds to enter the Share Purchase Agreement with HRSRL with the expectation that Itochu would purchase the shares of Devon Health and that Bennett could then use the money from that deal to repay the funds borrowed in anticipation of the agreement with HRSRL.

In Count IX, Bennett and Devon Robotics assert a claim of promissory estoppel against Itochu based on Itochu's promise that it would become a "50/50" partner with Devon Robotics with respect to the distribution and sale of CytoCare and i.v.Station and its promise that it would share in the expenses related to research and development fees and working capital expenses. In reliance on this promise Bennett and Devon Robotics entered agreements with HRSRL for the distribution and sale of i.v.Station and CytoCare.

A claim for promissory estoppel requires that the plaintiff show that the defendant made a promise that he should have reasonably expected to induce the plaintiff to act or refrain from acting, that the plaintiff actually relied on the promise and either took, or refrained from taking, action, and that enforcing the promise is the only way to avoid injustice. Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000). Importantly,

the promise that the defendant makes and on which the plaintiff relies must be a promise to do something in the future. Commonwealth, Dep't of Pub. Welfare v. Sch. Dist. of Phila., 410 A.2d 1311, 1314 (Pa. Commw. Ct. 1980) (citing Langer v. Superior Steel Corp., 161 A. 571 (Pa. Super. Ct. 1932)). If the promise is simply a statement of present fact, the claim is one of equitable estoppel, which is not a cause of action in Pennsylvania. Id.; see also Pelaso v. Kistner, 970 A.2d 530, 533 (Pa. Commw. Ct. 2009).

Plaintiffs have adequately stated claims for promissory estoppel. In both Counts, Plaintiffs have alleged that they entered into agreements with third parties based on Defendants' representations that they would close various deals. Plaintiffs reasonably relied on those promises because in each case they made it clear to Defendants that they were taking these actions based on the financial backing promised by Defendants.[4] Therefore, Defendants' Motion to Dismiss Counts VIII and XI is denied.

## IV. Conclusion

For the forgoing reason, Counts I and IV are dismissed. As to all other Counts, Defendants' Motion to Dismiss is denied.

---

[4] Again, this Court makes no determination as to whether the language in the Term Sheets or Letters of Intent provide a valid defense to Plaintiffs' claims.