**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
JOHN A. BENNETT, M.D., ET AL.,      :
                                    :
            Plaintiffs,             :    CIVIL ACTION
                                    :
       v.                           :    NO. 09-CV-1819
                                    :
ITOCHU INTERNATIONAL INC., ET AL., :    CONSOLIDATED WITH
                                    :    NO. 09-CV-4123
            Defendants.             :
```

**MEMORANDUM AND ORDER**

**Joyner, C.J.**                                **August 23, 2012**

This action is presently before the Court for disposition of Defendants Itochu International Inc., et al.'s Motion for Summary Judgment (Doc. No. 80 in Case No. 09-CV-1819), Defendant/Counter-Claimant MedSurg Specialty Devices, Inc.'s Motion for Summary Judgment (Doc. No. 79), and Plaintiff Itochu International Inc.'s Motion for Summary Judgment (Doc. No 81; Doc. No. 34 in Case No. 09-CV-4123;). For the reasons set forth in this Memorandum, the Court grants Defendants Itochu's Motion for Summary Judgment in part and denies the Motion in part; denies Defendant/Counter-Claimant MedSurg's Motion for Summary Judgment; and grants Plaintiff Itochu's Motion for Summary Judgment.

**FACTUAL BACKGROUND**

This case revolves around two robots designed to prepare medications—CytoCare and i.v. Station—and the various business

1

entities and subsidiaries that sought to reap financial gain through their distribution in North America.

John Bennett ("Bennett") was the Chief Executive Officer of Devon Robotics, LLC ("Devon Robotics") and the Chief Executive Officer of Devon Health Services, Inc. ("DHS"), both businesses involved in the distribution of health care supplies.[1]

Mounir Rabbat ("Rabbat") was the Executive Vice President and Chief Operating Officers of Defendant Itochu International Inc.'s ("Itochu") Enterprise Division. As head of the Enterprise Division for Itochu, Rabbat's direct supervisor was Yoshihisa Suzuki ("Suzuki"), the President and Chief Executive Officer of Itochu. Suzuki was responsible for Itochu's entire North American operations. Thomas Apple ("Apple") was Vice President, Corporate Counsel and Senior Advisor to the General Manager of Human Resources of Itochu during the relevant time period.[2]  Itochu owned several businesses, including its subsidiary MedSurg Specialty Devices, Inc. ("MedSurg"), a company involved in the distribution of various medical supplies and devices.[3]

---

[1] We collectively refer to Bennett, Devon Robotics, and DHS, the plaintiffs in Case No. 09-CV-1819 and the defendants in consolidated Case No. 09-CV-4123, as "Devon," and distinguish only where such distinction is relevant.

[2] We collectively refer to these individuals and entities, all defendants in Case No. 09-CV-1819, as "Itochu," and distinguish only where such distinction is relevant. With the exception of MedSurg, these entities are also plaintiffs in Case No. 09-CV-4123.

[3] Pursuant to his job responsibilities as head of the Itochu Enterprise Division, Rabbat oversaw the management of MedSurg at times relevant to this litigation. Ex. A at 70:21-71:6, Ex. B at 56:18-57:21, Ex. G at ITOCHU0101862. Unless otherwise indicated, citations to the record refer to the exhibits attached to Devon's Response in Opposition to Itochu's Motion for Summary Judgment, Doc. No. 84, Case No. 09-CV-1819 ("Resp.").

Devon's claims involve two overarching issues. First, whether Itochu is liable to Devon in regards to separate but related investment opportunities: (1) Itochu's alleged agreement to purchase shares in DHS and (2) Itochu's alleged agreement to share in the sale, distribution and service of CytoCare and i.v. Station, as well as to split the costs associated with procuring the rights to do so from Health Robotics, S.r.L. ("HRSRL"), an Italian company that developed, designed, marketed and licensed these two robotic medication preparation devices. Second, whether there was a material breach of a distribution agreement signed on November 5, 2008 by MedSurg and Devon Robotics, which all agree was a binding contract.

The parties in this case have a long history of negotiations and agreements spanning the course of several years. For our current purposes, we summarize only the pertinent factual background.

**(1)  Initial Negotiations Regarding Acquisition of Devon Health Services by Itochu**

Around 2007, Itochu and its Japan-based parent company, Itochu Corporation ("Itochu Japan") decided to look for investment and acquisition opportunities in the United States healthcare industry. At this time, Rabbat met Bennett and they began to discuss the potential purchase of DHS by Itochu. The negotiations regarding Itochu's acquisition of DHS persisted through 2008.

3

Several times the parties signed written documents related to the potential deal. On July 2, 2007, Rabbat, acting for Itochu, and Bennett, acting for DHS, signed a letter of intent. Def. Mot. Ex. A.[4] The letter states that it was a "non-binding expression of interest" regarding the "potential acquisition" by Itochu of 50% of DHS for $42.5 million, based on a valuation of $85 million. Id. On June 12, 2008, Bennett signed another similarly worded non-binding indication of interest letter. Def. Mot. Ex. L. The proposed terms changed, but the letter included identical language disclaiming any intent to be bound by its terms.

Bennett acknowledges that he understood Itochu's acquisition of DHS was subject to the approval of Itochu's internal Investment Committee. See Ex. F at 117:17-118:8. This committee consisted of Itochu senior executives, including Rabbat, who reviewed investment opportunities being brought forward for consideration by Itochu. See Ex. A at 226:8-227:23, Ex. B at 97:17-98:11, Ex. C at 61:11-62:25, Ex. J at 102:3-103:12; Def. Mot. Ex. C. The Committee members each weigh in on the proposal, and following a discussion, the Committee chair makes the ultimate decision whether to approve the proposed transactions. As CEO, Suzuki chaired the Investment Committee.

---

[4] "Def. Mot." indicates Defendants Itochu, et al.'s Motion for Summary Judgment in Case No. 09-cv-1819, Doc. No. 80.

Through his relationship with Itochu, Bennett believed that Suzuki and Rabbat had ultimate control over Itochu's internal deal approval process. Rabbat's communications with Bennett reinforced this understanding. In connection with the DHS deal, Rabbat assured Bennett that the Investment Committee had approved every past transaction Rabbat proposed to them. Bennett contends that when he first met Rabbat in 2007, Rabbat told him that the investment committee was merely a "rubber stamp" and that Rabbat "ha[d] never gone to the investment committee with a deal that [he] proposed that they haven't accepted." Ex. F at 118:11-119:24; see also id. at 137:9-21, 139:2-4; Ex. E at 14:12-18. Rabbat also admits that he never observed the Investment Committee override Suzuki's decision to move forward with a deal.

**(2) Shared Investment Opportunity in CytoCare and i.v. Station MedSurg's CytoCare Distribution Agreement with HRNA**

In March 2008, Bennett learned of an investment opportunity in Health Robotics North America, LCC ("HRNA") through Peter Camp ("Camp"), one of the company's principals with whom Bennett had a social relationship. At that time, HRNA had an existing agreement with HRSRL for the exclusive distribution rights to CytoCare, a robotic preparation device for cytotoxic medications. Bennett shared information of this possible investment opportunity in

5

HRNA with Itochu, and Itochu in turn passed this information to MedSurg.[5]

MedSurg had been experiencing financial problems. See Ex. A at 81:18-82:24; "Minute of MSD Monthly Executive Committee Meeting," Ex. D at III017_0018767 (recognizing that MedSurg's forecasted profits from 2008 were below budget projections). Rabbat took over supervision of the company in January 2008. In April 2008, the company hired Carl O'Connell ("O'Connell") to help improve the company's performance; O'Connell later became MedSurg's President. MedSurg, through its officers O'Connell and Flagg Flanagan, decided to move ahead with the CytoCare investment opportunity.

On June 10, 2008, MedSurg entered into a distribution agreement with Health Robotics, LLC ("HRLLC"), a subsidiary of HRNA[6] (hereinafter "MedSurg-HRNA CytoCare Distribution Agreement"). Ex. I at Devon0271881-97. Under this agreement, MedSurg leased the distribution rights to CytoCare. In exchange, MedSurg was required to meet an annual minimum sales quota throughout the three-year term of the agreement. Starting on January 1, 2009, MedSurg was required to pay HRNA $660,000 in

---

[5] For some time, Bennett had been working to form an alliance with Itochu to cultivate investment opportunities for Itochu. See Ex. A at 145:22-146:19; Ex. E at 20:15-24:15, 49:3-65:11; Ex. G at ITOCHU0024439.
[6] The agreement was signed by HRLLC and by Jack Risenhoover. Risenhoover was also a principal of HRNA. While HRNA and HRLLC are two separate entities, both were controlled by Risenhoover and Camp and the parties refer to the entities interchangeably. As the distinction is not relevant to the present action, for clarity we follow suit and consistently refer to these entities, together or separately, as HRNA.

monthly minimum purchases, amounting to a $19 million owed over the life of the agreement. MedSurg also paid $1 million to HRNA for the initial purchase of two CytoCare robots. Finally, the agreement included a non-compete clause that prohibited MedSurg from negotiating or entering into an agreement to purchase robotic products with intravenous medicine preparation capabilities for three years. The terms of this agreement were negotiated exclusively by MedSurg and never presented to the Itochu Investment Committee for approval. See Ex. A at 123:9-125:11. Itochu was not a party to this agreement.

Though Rabbat himself had approved the transaction, immediately following the execution of this agreement, he became concerned about its terms. MedSurg leased the rights to CytoCare from HRNA before realizing that HRNA had repeatedly breached its obligations to HRSRL, placing the very rights MedSurg had leased through HRNA in jeopardy. While MedSurg paid $1 million to HRNA for two CytoCare robots, these devices had not yet been manufactured and no one at the company had observed the robot's functionality.

### *Proposed Formation of a New Company to Take Over Distribution of CytoCare*

Rabbat was involved in the distribution of CytoCare through his role at Itochu overseeing MedSurg, and wanted to find a way to ensure the success of MedSurg in this endeavor. He suggested that Bennett and Itochu form a new company ("Newco") in which

7

Itochu and DHS would share equal interests, and the principals of HRNA would have minority interests, over the rights and distribution to CytoCare. See Ex. D at III017_0012162; Ex. I at Devon0130025. Under this proposal, Newco would have a direct robot distribution agreement with HRSRL, provide robot service and maintenance, and acquire HRNA's existing CytoCare customer contracts while MedSurg would continue its distribution role.

Throughout early August 2008, MedSurg, Itochu and Bennett actively engaged in various discussions regarding the formation of a new, jointly-owned company to control the rights to CytoCare. Rabbat communicated a sense of urgency given the uncertain financial health of HRNA. Id.

### *Investment Opportunity in i.v. Station*

In early August 2008, HRSRL was in the process of developing another robotic medication preparation device: i.v. Station. In contrast to CytoCare, i.v. Station prepared non-hazardous medications for which there was a more widespread demand in hospitals. Thus, i.v. Station was anticipated to be more lucrative. Gasper DeViedma ("DeViedma"), General Counsel for HRSRL, communicated to Itochu and DHS that he wanted a single entity to controlling both of HRSRL's robotic medicine preparation devices—CytoCare and i.v. Station—in the North American market. Based on DeViedma's representations, the parties believed that securing the rights to i.v. Station was a critical

8

step towards acquiring the rights to CytoCare. According to
Bennett, by signing i.v. Station—the "big deal"—it would ensure
that CytoCare—the "little deal"—went into the same hands. Ex. F
at 209:23-210:4. The parties envisioned that the newly formed
company they were working to create would share the rights to
both CytoCare and i.v. Station robots and capitalize on the North
American healthcare market for these two products.

By August 15, 2008, a shared consensus emerged. DeViedma,
Bennett and Rabbat were all interested in reaching an agreement
to consolidate the rights to the manufacturing, marketing,
distribution and services for CytoCare and i.v. Station under one
organization. However, under the terms of HRNA's contract with
HRSRL for the rights to CytoCare, HRNA had a right of first
refusal to manufacture and distribute i.v. Station. Despite
warnings from HRSRL of material and repeated breaches, this
contract was still in effect. HRNA's right of first refusal
expired on August 15, 2008, at which time other entities could
move to secure the rights to i.v. Station. At this time, the non-
compete clause in MedSurg's contract with HRNA was also in
effect. As such, MedSurg was prohibited from negotiating or
contracting with HRSRL for the rights to distribute i.v. Station
even if HRNA passed on the opportunity.

9

***Devon Robotics' i.v. Station Distribution Agreement with HRSRL***

On August 22, 2008, Bennett, acting on behalf of the newly formed Devon Robotics, entered into an agreement with HRSRL for the exclusive licensing, manufacturing, services and distribution rights to i.v. Station in North America. Ex. D at III017_0004390-91. This agreement obligated Devon Robotics to pay over €9.8 million in advanced licensing fees to HRSRL before 2014 and €2.7 million in product development fees subject to HRSRL's satisfaction of certain performance goals, of which €675,000 was due and paid by Devon Robotics on August 25, 2008. Devon Robotics also agreed to use commercially reasonable efforts to acquire the exclusive distribution rights to CytoCare by September 25, 2008.

Bennett entered into these commitments alone but with the expectation that Itochu would share in costs and liabilities. Bennett claims that he asked Rabbat to execute the i.v. Station distribution agreement with him before August 22nd and Rabbat responded that he couldn't do that because of the non-compete in MedSurg's contract with HRNA. Ex. E at 210:6-20. However, Rabbat told Bennett to enter into the agreement for i.v. Station with HRSRL and that he would be "good for half of the money." Id. According to Bennett, Rabbat also discussed using Bennett as a placeholder to secure the rights to i.v. Station so that Rabbat could put leverage on HRNA in his dealings through MedSurg. Id. at 15:23-16:16. Rabbat allegedly asked Bennett to invest on

Rabbat's behalf but told Bennett that he would invest 50/50 in the i.v. Station venture at a later point. Id. at 16:18-17:4. See Email from Bennett to Rabbat (Sept. 26, 2008), Ex. D at III017_0013801 ("[I]n the spirit of good will and with the assurances of Itochu; I personally invested in IV station. I now have no assurance that Itochu will follow through on that commitment either"). Bennett agreed to serve as a placeholder of the distribution rights with the understanding that Itochu and DHS would form Newco to share the responsibility and liability of distributing i.v. Station. See Ex. F at 211: 12-20, Ex. P at 199:12-200:5, Ex. I at Devon0133856.

Neither Rabbat nor any other personnel of Itochu or MedSurg signed the i.v. Station distribution agreement with HRSRL. The agreement does not mention either of these entities. However, Devon provides evidence to suggest Rabbat, acting on behalf of Itochu, promised to share in the venture with Bennett and was aware that Bennett entered the agreement with HRSRL with this expectation. In a series of conversations through summer 2008, Rabbat told Bennett that "to get a venture approved directly from their investment counsel was of great difficulty unless [Bennett] put some seed capital in...[and] at worse case, [he'd] be a 50/50 investor and [Itochu] would take the lion's share of any

investment in any—anything that [Bennett] invested in on their behalf." Dep. of Bennett, Ex. E at 27-17-30:9.[7]

***The Newco Agreement***

Rabbat and Bennett, along with their respective employees, worked to structure a deal for a new company that would share the rights to the robots. On September 8, 2008, Itochu, Devon Robotics, and HRNA reduced their negotiations to writing and each signed the "Newco Agreement," which outlined the respective ownership in and roles and responsibilities relative to the formation and operation of the proposed joint company to share the rights to CytoCare and i.v. Station in North America. Def. Mot. Ex. O. This agreement acknowledged that HRNA and MedSurg had an exclusive distribution agreement for the CytoCare robot in North America.[8] Moreover, the agreement acknowledged that Devon Robotics had entered into an exclusive licensing, manufacturing, services and distribution agreement with HRSRL for the rights to

---

[7] See also Email from Rabbat to Bennett (Aug. 15, 2008), Ex. I at 0134035 ("I believe that your agreement with Gaspar was a master move...I will work internally to get approval ASAP"); Email from Rabbat to Friis/Wesel (Sept. 4, 2008), Ex. D at III017_0013093 ("Since Devon already committed to the IV station and we already committed to Devon to share with them the investment; documents for internal approval need to be completed...I understand that final agreement with [HRNA] has not been reached but this should not prevent us from preparing the application documents to get the IC approval"); Email from Friis to Wesel (Sept. 4, 2008) Ex. D at III017_0013092 ("I believe the urgency is Mounir's commitment to John to have approval by early September. This was made when John agreed to front the deal until we could get approvals"); Email from Rabbat to Friis (Sept. 5, 2008), Ex. G at Itochu0013127 ("We (Devon/III) already committed to work with Gaspar for the IV and Cytocare..."); Email from Rabbat to Friis (Sept. 30, 2008), Ex. D at III017_0029336 ("PS when John paid the 1 million for the IV He did call me first and I gave him verbal assurance that we r together on this deal").

[8] While the agreement refers to MedSurg throughout, MedSurg was not a delineated party to the agreement. Rabbat signed on behalf of Itochu. There is no signature attributed to MedSurg. See Ex. M at HR01722.

i.v. Station within North America. Finally, the parties stated that it was their desire to terminate certain existing agreement so that a new agreement could be entered into under which they would work together with respect to the sale and distribution of CytoCare and i.v. Station.

Under the proposed arrangement, the parties would form a new company ("Newco") that would enter into several agreements, including the negotiation and execution of a new exclusive agreement concerning the rights to CytoCare with HRSRL, the negotiation and execution of a new distribution agreement with MedSurg to supersede the existing arrangement between HRNA and MedSurg regarding the rights to CytoCare, and the issuance of a renewable bank-issued $5 million Letter of Credit to guarantee Newco's future obligations to HRSRL. Itochu and Devon Robotics would each have 26% equity ownership of Newco and Camp and Risenhoover, HRNA's principals, would each have 24%. Itochu would supply $4 million in working capital for one year and a $5 million Line of Credit for the benefit of HRSRL, guaranteed by Devon Robotics. If executed, the proposed arrangement would result in the cancellation of the June 10, 2008 Distribution agreement between HRNA and MedSurg. However, this contract, and its non-compete restriction, remained in effect for the time being.

The parties agreed to the Newco Agreement "on a nonbinding basis" because they "wish[ed] to establish a framework for considering, and if all parties agree[d], entering into all of the transactions set forth [t]herein." Ex. M at HR01716. The agreement outlined several conditions required if closing were to take place, as anticipated, before the end of September, including the approval of the full Itochu Investment Committee. Id. at HR01721. Importantly, the agreement included an explicit statement of intention:

> This document represents the intention of all parties to explore the possibility of entering into the transactions described herein. Except as expressly stated herein, it is not intended to be a legally binding commitment by the parties nor shall it be interpreted to compel any party to enter into any agreement. Legally binding commitments shall not rise until execution of definitive agreements which will set forth and shall be the exclusive expression of all binding provisions. Id. at HR01722.

On this same day, HRSRL terminated its contract with HRNA for the licensing rights to CytoCare.

**_Bennett's CytoCare Distribution Agreement with HRSRL_**

Only days later, on September 12th, Devon Robotics went ahead and executed a second contract with HRSRL, this time for the exclusive licensing, manufacturing and distribution rights to CytoCare in North America. See Ex. I at Devon0134716-59. Under the terms of this agreement, Devon Robotics agreed to pay HRSRL over €15 million in license fees through 2012 as well as to satisfy certain past due obligations of HRNA. Devon Robotics was required to pay €726,339 of HRNA's past due amounts by the end of

14

September 2008. The parties intended that Devon Robotics would
assign the CytoCare agreement with HRSRL to Newco after the
closing of the Newco Agreement. See, e.g., Email from Wesel to
Rabbat (Sept. 9, 2008)("Although we intend to be a party to [the
CytoCare agreement] via our investment in Newco, the agreement
will be assigned to Devon Robotics and assigned to Newco after we
close"). However, it is uncertain whether Itochu and MedSurg
condoned the terms of the deal Bennett executed with HRSRL. See
Email from Friis to Rabbat (Sept. 29, 2008), Ex. D at
III017_0013801 ("My clear understanding is that John signed the
CytoCare deal with Gasper despite our disagreement to the terms
of the LC. Now, John is claiming that it was in full
consideration with MedSurg and Itochu implying that it was with
our agreement. Correct, both Carl and Steve participated in
discussions, but they did not agree to the deal. Or is there
something I don't know?").

***Itochu Investment Committee's Review of Newco Agreement***

By early October, Bennett had become increasingly impatient
with the delay in executing the Newco deal. Payment deadlines
under Devon Robotics' contracts with HRSRL heightened the urgency
to complete this deal. On October 3, 2008, Bennett wrote to
Rabbat about the Newco/HRNA deal: "I need you to guarantee me
that you will be able to close the transaction by October 13th.
If you are unable to make this guarantee then I will close the

door on continuing this transaction with Itochu or MedSurg."
Email from Bennett to Rabbat (Oct. 3, 2008), Ex. I at
Devon0112250-51. Rabbat explained to Bennett that he was
scheduled to present the proposal to the Investment Committee the
next week and expected to receive final approval then. He also
cautioned: "Unfortunately as I repeatedly mentioned, I do not
have the luxury to quickly move on a project without going
through the bureaucracy and due diligence requiring a lot of time
and expenses. I know this is frustrating to you but it is not in
my power to change it." Id.

On October 9, 2008, Rabbat presented the proposed Newco deal
to the Itochu Investment Committee. See Def. Mot. Ex. P.  The
next day Rabbat relayed the reaction of the Investment Committee
to both DeViedma and Bennett, explaining that they had "received
directional approval to go ahead with the proposed deal with
Health Robotics [HRNA], subject to meeting certain conditions."
Ex. I at Devon0112146. The Investment Committee wanted to change
the structure of the deal to eliminate HRNA's ownership in Newco.
In addition, Rabbat reiterated that the Newco documents needed to
be finalized and the Committee would need to review these. Rabbat
also mentioned that Itochu would need final execution approval
from both NY and Tokyo. Finally, "as proof of [Itochu's] strong
desire to move ahead," Itochu offered to wire HRSRL $300,000 as
an advance on the Newco obligations, asking in return for HRSRL's

16

patience as Itochu completed all required documents and closed the transaction. Id.

DeViedma responded to both Rabbat and Bennett with hesitation, concerned about the delay of compensation for the outstanding debt owed by HRNA as well as the uncertain status of Itochu's approval:

> I am supposed to introduce you in Japan as my partner and if I interpret your email correctly you might not be my partner at all. This is very problematic for me...If this is just a rubber stamp, then my answer to your request is yes, but if this delay is potentially a deal killer then I am sorry but I cannot grant your request because it is time we would then move in a different direction. Ex. I at Devon0112145.

Rabbat replied immediately, including Bennett in the correspondence, that addressing the role of HRNA in Newco was the main remaining hurdle and that the management of Itochu "had already approved the deal pending the resolution of the Newco structure and completion of legal documents." Id. Rabbat stated that based on his previous experience, he was "very confident that the deal [would] be approved" at that point. Id. Itochu paid HRSRL $300,000 in exchange for the exclusive opportunity for Itochu and Devon Robotics to complete a deal with HRSRL before the end of October. If the deal was completed, the advanced amount would be credited toward the future obligations of Itochu and Devon Robotics.

17

***Itochu Investment Committee's Review of Revised Newco Proposal***

Rabbat engaged in a flurry of email correspondence with Itochu personnel throughout the remainder of October, all geared toward completing a revised proposal that could be submitted to the Investment Committee for review. By the end of October, pressure to complete a deal quickly had mounted. HRNA still owned the rights to contracts with hospital customers for CytoCare, but lacked the resources and distribution rights to service them. HRSRL planned to meet with customers the first week of November to go over the transition from HRNA control. If a new deal was not in place, DeViedma threatened to get their CytoCare contracts assigned back to HRSRL. See Ex. D at III017_0014679; Ex. G at ITOCHU0015660. On October 24th, DeViedma contacted Rabbat and Bennett to clarify, with urgency, that the promised Line of Credit would be extended right after October 31st and that the outstanding payments owed would be paid at the close of a transaction between Itochu, Devon Robotics and HRNA. Ex. I at Devon0112146.

That same day, Rabbat received comments from Itochu Japan's Healthcare Business Department regarding the Newco deal and recommending that Itochu avoid any equity ownership because of the risk associated with CytoCare product liability. Ex D at III017_0015289. As an alternative to equity participation, they recommended 0% ownership and a $4 million Line of Credit.

18

Nevertheless, on October 27, 2008, Rabbat again presented the proposal to the Itochu Investment Committee for approval. This time the deal excluded HRNA; under the new terms, Devon Robotics and Itochu would share 50-50 equity ownership. The Investment Committee rejected this proposal. Itochu had decided that it didn't want to hold equity in Devon Robotics. <u>See</u> Dep. of Rabbat, Ex. A at 216:5-15; Dep. of Suzuki, Ex. B at 153:25-154:10.

On October 28, 2008, Bennett stressed to Rabbat the need to get a deal signed and that Rabbat should "make necessary decisions to get it done." Ex. D at III017_0015572. The next day Rabbat proposed the revised idea from Itochu headquarters. <u>Id</u>. at III017_0015587. Under this proposal, Devon Robotics would be the sole owner of Newco, with Itochu issuing a Line of Credit for $4 million in working capital for one year to Devon Robotics as well as the $5 million Line of Credit to HRSRL backed by Devon Robotics. In exchange, Devon Robotics (through Newco) would grant exclusive distribution rights to MedSurg for CytoCare and i.v. Station. Rabbat explained to Bennett that this would "eliminate all hurdles," "result in a swift agreement between Devon and HRNA" and that he believed it was "the fastest way to complete this deal by this week end and provide [Itochu] with distribution rights and Devon with all other rights." <u>Id</u>. Bennett responded: "I am good to go with this solution. Get it done." <u>Id</u>. Bennett also communicated this new plan to DeViedma, ensuring that the

Line of Credit and payments were on schedule and that Devon
Robotics would own 100% of the company contracting with HRSRL.
Ex. G at ITOCHU0015660.

Devon characterizes this arrangement as "Bridge Financing"
and claims that "Rabbat did not tell Bennett that [it] was
intended to replace Itochu's original promise to act as Bennett's
equal partner in Newco." Resp. at 26.

### Devon Robotics' Settlement Agreement with HRNA

On October 31, 2008, Bennett executed a settlement agreement
with HRNA. See Ex. M at HR01949-67. While Itochu was not a party,
the agreement references the Line of Credit that Itochu promised
to provide. The agreement also released MedSurg from prior
obligations to HRNA. MedSurg became free to enter a distribution
agreement with Devon Robotics who held the CytoCare and i.v.
Station licenses. Devon Robotics agreed to pay $3.5 million to
HRNA, $970,828 of which would be placed in escrow before November
4, 2008 so long as the existing hospital contracts for CytoCare
were transferred to Devon Robotics.[9]

### November 5th Meeting at Itochu's Offices

The parties met at Itochu's offices in New York on November
5, 2008. On this date, John Bennett, accompanied by Robert
"Barry" Mulhern ("Mulhern"), general counsel for DHS and Devon

---

[9] Some of these obligations would later be shared equally by Devon Robotics
and MedSurg pursuant to the MedSurg Distribution Agreement ("MDA") executed on
November 5, 2008, discussed *infra* Part III.

20

Robotics, signed three written documents: (1) the MedSurg Distribution Agreement ("MDA"), (2) the $4 million Loan & Security Agreement, and (3) a $5 million Guaranty Agreement. The majority of Bennett's present claims are based on his reasons for signing these agreements, and the parties' oral conversations at this time.

Thomas Apple, legal counsel for Itochu and MedSurg, sent a draft of the MDA to Devon Robotics[10] at 10:43pm on November 4, 2008. This draft included an annual sales quota and provisions in the event that MedSurg did not meet its requirements. See Ex. I at Devon0152520, § 6.

Bennett met with Rabbat alone on the morning of November 5th. See Dep. of Bennett, Ex. F at 153:4-25; Dep. of Wesel, Ex. Q at 185:4-189:2. Rabbat advised Bennett that Itochu did not want the Distribution Agreement between MedSurg and Devon Robotics to require Medsurg to sell any minimum number of CytoCare robots. Ex. A at 282:15-283:24. In order to complete the deal that day, the quotas had to be removed. Rabbat allegedly also promised Bennett that in consideration for agreeing to remove the minimum quota, he would ensure the long-standing negotiations related to Itochu's investment in DHS resulted in a completed transaction by the end of the year and that he would make Bennett whole on the i.v. Station deal. According to Bennett, Suzuki confirmed this in

---

[10] The email was sent to Mulhern as well as Wesel and Francis Lutz, Chief Financial Officer for DHS and Devon Robotics.

a private conversation with Bennett in the hallway outside the conference room and right before the deals were executed. Suzuki told Bennett not to be concerned about the removal of minimum quotas because Itochu would cover Bennett and Devon Robotics so that there would be no loss. Relying upon these statements by Suzuki and Rabbat, Bennett, acting on behalf of Devon Robotics, entered into a Distribution Agreement with MedSurg that contained no minimum quotas for the sale of CytoCare robots. See Dep. of Bennett, Ex. F at 49:4-51:25, 159:4-160:19, 165:21-167:24.

### (a)  The MedSurg Distribution Agreement ("MDA")

Under the terms of the MDA, MedSurg would be the exclusive distributor for CytoCare in North America for three years. See Def. Mot. Ex. D. MedSurg was also responsible for implementing and executing the creative marketing strategy. MedSurg agreed to spend no less than $500,000 annually to promote CytoCare and to establish a sales team. While there were no purchase or sales requirements, the contract did contain nonbinding sales objectives. MedSurg was also required to fund $180,000 of a clinical trial of CytoCare at the Brigham's and Women's Hospital.

### (b)  The $4 million Loan & Security Agreement

Under the terms of the Loan & Security Agreement and accompanying Promissory Note, Itochu agreed to extend a $4 million Line of Credit directly to Devon Robotics. See Def. Mot. Exs. U and V. In exchange, Devon Robotics agreed to pay an

22

additional $300,000 to Itochu for the advance down payment Itochu had previously paid to HRSRL on Devon Robotic's behalf. This Agreement provided Itochu with a Call Option under which Itochu "shall have the right, but not the obligation to purchase one-half (1/2) of the membership interests in" Devon Robotics on terms set forth in the Agreement.

**(c)   The $5 million Guaranty Agreement**

Under the terms of the Guaranty Agreement, Itochu agreed to extend a $5 million line of credit to support Devon Robotics' payments to HRSRL, but only on the express condition that Devon Robotics adhere to the terms and conditions set forth by Itochu in this agreement. The Guaranty Agreement recognized that Devon Robotics had entered into an exclusive licensing agreement with HRSRL on Sept. 12, 2008 and that MedSurg had contracted with Devon Robotics to secure distribution rights in certain defined territory for the HRSRL licensed robots. See Def. Mot. Ex. W.

***Interactions Following the November 5th Meeting***

Immediately following the November 5th meeting, Bennett emailed Rabbat: "I am glad we have gotten the deal done today. As you may realize the dropping of any guarantees by MedSurg shifts all the liabilities to me since I guarantee the notes. I did not want to make an issue of this today because of the urgency of completing this transaction. I will have a meeting with you in the next 2 weeks to go over the capital needs of newco. We agreed

23

to share them 50/50." Ex. I at Devon0109152. Rabbat responded the
next day: "Regarding newco capital, as I mentioned I will work
with you as much as I can, but please keep in mind that I am
bound by Itochu internal regulations and investment criteria.
This is why your idea about the investment in DHS may be a good
way to solve the capital needs." Id.

On November 7, 2008, Devon drew down the entire $4 million
Line of Credit, made available under the Loan & Security
Agreement, to fund its immediate obligations to HRSRL and HRNA.
See Ex. I at Devon000293-34, Ex. Q at 191:22-192:22.

Then, on November 11, 2008, Rabbat and Bennett signed a
renegotiated version of the proposed acquisition of shares in DHS
by Itochu. Def. Mot. Ex. M. The document is titled as a "non
binding indication interest" letter. Under its proposed terms,
Itochu would purchase 50% of the common stock of DHS for $27
million. The letter details conditions necessary before any
agreement could be entered and states that "binding obligations
[would] only arise through the execution of definitive agreements
expressing a clear and express intention to be bound in
accordance with the terms thereof." Id. at ¶ 9. The document
stated that the deal was to close on December 15, 2008.

Bennett still believed that Itochu would fulfill a
commitment to fund 50% of Devon Robotics via an equity investment

24

in the company, and Itochu personnel, including Rabbat, were aware of Bennett's belief.[11]

***Share Purchase Agreement Between Devon Robotics and HRSRL***

In reliance on the agreements negotiated with Itochu, Devon negotiated a Share Purchase Agreement with HRSRL. <u>See</u> Ex. G at Itochu0116648-57. Under its terms, Devon Robotics agreed to pay HRSRL €6 million for 13.33% of the shares in HRSRL. This agreement was also set to close on December 15, 2008.

Bennett planned to use proceeds from Itochu's purchase of DHS's shares to fund Devon Robotics' purchase of shares in HRSRL. <u>See</u> Ex. I at Devon0073434. However, on December 10, 2008, five days before the anticipated closing of the Share Purchase Agreement between Devon Robotics and HRSRL, Rabbat informed Bennett that Itochu would not proceed with the transaction as outlined in the November 11, 2008 Term Sheet. As a result, Devon Robotics withdrew from the Share Purchase Agreement with HRSRL.

***December 19, 2008 Term Sheet for the Acquisition of DHS by Itochu***

---

[11] <u>See</u> Email from Wesel to Rabbat (Nov. 13, 2008), Ex. D at III017_0016124 ("John is of the mindset that III WILL fulfill next year, a commitment to fund 50% of Devon equity investment. Although we are pursuing the DHS transaction so John can fulfill the upcoming [HR]SRL equity purchase ($8MM) and the next IV Station fundings ($3MM), he is doing so because of the timing constraints and the elongated timing requirements of ITOCHU, similar to him signing up IV Station and CytoCare deals with SRL in advance of our own internal approval process...in light of Tokyo's refusal to allow our direct equity participation in [Devon Robotics], our promoting CytoCare in such a public forum from ITOCHU/III Corporate may have the undesirable effect of raising John's expectations to fully participate alongside him, as described above"); Response from Rabbat to Wesel (Nov. 13, 2008), Ex. D at III017_0016125 ("Thanks for your words of caution. We should go ahead with the PR piece regardless, I will make sure with John today about [Itochu] position").

On December 19, 2008, the parties signed a Term Sheet that incorporated by reference the conditions listed in the November 11, 2008 Letter of Intent. Def. Mot. Ex. N. The agreement outlined new terms under which Itochu agreed to purchase 30% of the shares of DHS for $16.5 million. The Term Sheet outlined each party's responsibilities prior to the execution of a definitive, binding agreement for Itochu to purchase an ownership interest in DHS. The Term Sheet also provided that the deal would close no later than January 23, 2009.

***Amended Share Purchase Agreement Between Devon Robotics and HRSRL***

In reliance on the December 19, 2008 Term Sheet, Devon Robotics entered into an Amended Share Purchase agreement with HRSRL. Under these new terms, Devon Robotics agreed to pay HRSRL €12.5 million for 40% of the shares in HRSRL with a non-refundable deposit of €5 million. Bennett claims that his decision to proceed with this transaction stemmed from conversations he had with Rabbat on and around December 14th. See Email to DeViedma from Bennett (Dec. 15, 2008), Ex. I at Devon0074071 ("I am able to extend this offer because my transaction with Itochu was confirmed today"); Email to Rabbat from Bennett (Dec. 15, 2008), Ex. I at Devon0074070 ("I re issued the offer based on our discussions yesterday. Please don't let me down"); Response from Rabbat (Dec. 16, 2008), Id. ("Thank you and I will not let you down"); Ex. F at 163:3-24.

26

Ultimately, Itochu and DHS never closed their deal, and Devon Robotics did not execute the share purchase with HRSRL.

***Performance under MedSurg Distribution Agreement ("MDA")***

Shortly after the MDA was executed, the parties began disputing who should have day-to-day control over sales and marketing. Bennett was concerned that MedSurg would not achieve the sales objectives laid out in the MDA. He sought to have responsibility for sales of the robots vested in Joe Santoro, the president of Devon Robotics at that time. Def. Mot. Ex. B at 170:17-171:11. According to Bennett, Devon Robotics did not actually take over responsibility for sales of CytoCare until April or May. Id. at 171:5-17. However, Santoro testified that Devon Robotics assumed responsibility for the sales and marketing efforts for CytoCare robots in December 2008 because at that point "it became clear that MedSurg wasn't going to be able to sell the volumes that [Devon Robotics] need to sell." Def. Mot. Ex. Y at 65:23-66:23.

By February 2009, Itochu had not funded a purchase of DHS shares, hadn't become a shareholder in Devon Robotics, and hadn't put any additional capital into the CytoCare and i.v. Station venture. MedSurg had not secured any sales contracts for CytoCare; in fact, MedSurg never did. See Ex. E at 178:24-179:4.

Devon Robotics was in serious financial distress and seeking resolutions, including requesting a $10 million loan from Itochu.

27

See Ex. F at 65:10-16; Ex. I at Devon0075848 ("MedSurg is
responsible for sales and there has not been 1 sale. [Rabbat]
wrote to me that he would not let me down about my purchase of
shares in [HRSRL]"). On February 8, 2009, Mulhern, Devon
Robotics' counsel, explicitly reminded Rabbat of the financial
commitments made in mid-December. Rabbat responded:

> Of course, I promised John to come through the DHS
> investment and I am still committed to do so. This promise was
> made after my meeting with him in his office and related to him
> the Investment Committee decision to go ahead with 30% investment
> in DHS under certain conditions including closing after December
> 31st and meeting some conditions that was related to Devon. Ex. I
> at 0075848.

On February 10, 2009, Mulhern wrote to Rabbat, copying Bennett:

> We have explained to you several times the extreme financial
> predicament we are in as a result of the lack of CytoCare sales
> by the MedSurg sales team. There are obligations that are
> incurred in order to operate the business as well as the
> requirements concerning the monthly payment of license fees to
> Health Robotics, and there is no revenue from any sales to offset
> these obligations. When we were first discussing the distribution
> agreement with MedSurg, there were binding sales quotas...At your
> request, we removed the binding quotas from the agreement (which
> still includes nonbinding objectives), and the reality is that
> there have been no sales...The $5 million letter of credit issued
> by Itochu will be called if the license fees are not paid on
> February 28, 2009, and our present situation is that there are no
> funds available to pay those franchise fees. Therefore, Health
> Robotics will call the letter of credit. To resolve this perilous
> situation, we need an infusion of $10 million cash. We are
> willing to accept this as loan to Devon Robotics. I cannot
> overemphasize the seriousness of this situation and the need for
> an immediate response from you. Ex. I at Devon0137151.

***First Notice of Alleged Material Breach of MDA***

That same day, Mulhern sent a separate letter to Rabbat and
to O'Connell, the President of MedSurg, claiming that MedSurg had
materially breached the Distribution Agreement and demanded that

28

cure be made within 30 days, and if not, Devon Robotics may

terminate the Agreement at its discretion. Def. Mot. Ex. Z. The

letter identified the following events of default:

(1)   MedSurg was solely responsible for implementing and executing
      the creative marketing strategy, but failed to reimburse Devon
      Robotics for work it performed on such tasks.

(2)   MedSurg had improperly included the $180,000 earmarked for the
      Brigham and Women's Hospital study in its required allocation
      of $500,000 towards sales promotions.

(3)   MedSurg had not used commercial best efforts to meet the sales
      objectives outlined in the Agreement, as evidenced by the
      complete lack of sales.

(4)   MedSurg had not established an appropriate sales team under
      the parameters outlined in the Agreement.

(5)   MedSurg had not maintained a place of business staffed with a
      reasonably adequate force of competent sale personnel.

(6)   MedSurg was insolvent.

**DeViedma Becomes Chief Operating Officer at Devon Robotics**

In an email sent on February 14, 2009 from DeViedma to the

staff of Devon Robotics, including Bennett and copying Rabbat,

DeViedma discussed sales operations at Devon Robotics in the wake

of Santoro's immediate resignation. According to DeViedma,

Bennett created the Office of the Chief Operating Officer (COO),

a position that DeViedma then filled. The sales staff reported to

DeViedma. Ex. I at Devon0000214.

**March 12, 2009 Letter from Itochu to Devon**

On March 12, 2009, George Ikeda, corporate counsel for

Itochu, wrote to counsel for Devon Robotics to communicate the

willingness of Itochu to consider proceeding with the proposed

equity purchase in DHS by Itochu as outlined in the December 19,
2008 Term Sheet. <u>See</u> Ex. G at Itochu0110432(R)-450(R). This
letter alludes to a meeting between Bennett and Itochu senior
management the day before. Itochu mandated additional requisite
conditions prior to the closing of any such transaction. First,
Itochu wanted an arrangement for the immediate and full repayment
of the $4 million loan to Devon Robotics, including interest, out
of the proceeds of the purchase of DHS shares. Second, Itochu
wanted Devon Robotics to purchase the two CytoCare units
currently owned by MedSurg for $1 million, money that would come
out of the proceeds of the proposed transaction. Third, Itochu
wanted an agreement from Devon Robotics that MedSurg had the
exclusive rights to i.v. Station, and that Devon Robotics could
not sell distribution rights to products covered by the MDA
without mutually agreeable compensation to MedSurg. Itochu also
wanted Bennett to further guarantee the $5 million Line of Credit
extended under the Guaranty Agreement. Bennett would be required
to turn over additional DHS shares to Itochu if Bennett failed to
immediately satisfy a demand for repayment of any outstanding
amount. Finally, under these new terms, Bennett and his
affiliated entities were required to fully indemnify Itochu for
any exposure or liability to HRNA and its affiliates, and to
waive any claims against Itochu and MedSurg.

30

Bennett refused to agree to these terms. See Ex. F at 117:3-12. No purchase of DHS shares by Itochu was ever executed.

***Second Notice of Alleged Material Breach of MDA***

On March 23, 2009, Mulhern sent another letter claiming that MedSurg was still in breach of its contract with Devon Robotics. See Def. Mot. Ex. AA. The listed events of default match those outlined in the first notice of material breach. However, Devon Robotics also listed two additional bases for default: MedSurg had limited its budget to a mere and inadequate $500,000 for 2009, and MedSurg had not paid the obligated amount for the Brigham and Women's Hospital study. Devon Robotics claimed that MedSurg's material breach jeopardized Devon Robotics' ability to meet obligations under its contract with HRSRL, which might in turn result in a material breach by Devon Robotics.

On or around March 31, 2009, HRSRL noticed the drawdown of the $5 million Line of Credit in its entirety. Ex. D at III017_0017191. Around this time, HRSRL also noticed Devon Robotics' breach of the CytoCare Distribution Agreement. Id. at III017_0001652-53.

On April 24, 2009, MedSurg ceased all sales of CytoCare and terminated its entire sales staff. Devon Robotics terminated the Distribution Agreement with MedSurg on April 28, 2009. Ex. I at Devon0000111. Finally, on July 25, 2009, HRSRL terminated Devon Robotics' rights as a distributor of CytoCare. Def. Mot. Ex. CC.

31

**PROCEDURAL HISTORY**

On April 10, 2009, Itochu International Inc. filed a complaint in the U.S. District Court for the Southern District of New York against Devon Robotics seeking repayment under the terms of the Loan & Security Agreement.[12]

Devon Robotics in turn filed a complaint in the U.S. District Court for the Eastern District of Pennsylvania against Itochu and MedSurg on April 29, 2009. This complaint was amended on September 21, 2009. As these two cases involved the same factual background and issues, they were ultimately consolidated before us on September 30, 2009, along with several other related actions, for pre-trial purposes only. See also Health Robotics, LLC, et al. v Bennett, et al., No. 09-CV-627; Bennett et al. v. Itochu International Inc., et al., No. 09-CV-1819; and Devon Robotics, LLC, et al. v. DeViedma, et al., No. 09-CV-3552. Then, on December 21, 2009, the current case, No. 09-CV-1819, was consolidated for all purposes with Case No. 09-CV-4123.

We granted Itochu's Motion to Dismiss in part on January 26, 2010, dismissing Count I for Defamation and Count IV for Negligent Misrepresentation. See Doc. No. 38. We denied Devon's Motion for Reconsideration of that Order on March 3, 2010.

On June 20, 2011, Itochu filed the present Motion for Summary Judgment as to the remaining claims against them in Case

---

[12] On May 1, 2009, Itochu amended this Complaint to add DHS and Bennett as Defendants.

No. 09-CV-1819: Count II for Breach of Contract, Count III for Fraudulent Misrepresentation, Count V for Breach of Duty to Negotiate in Good Faith, Counts VI and VII for Breach of Oral Contract, and Counts VIII and IX for Promissory Estoppel. These same entities, serving as plaintiffs in the consolidated case, No. 09-CV-4123, filed a Motion for Summary Judgment on their initial complaint against Devon for breach of contract. Finally, MedSurg sought summary judgment on its counterclaims against Devon Robotics for breach of contract.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535 (3d Cir. 2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the non-

moving party cannot rely on "bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F. 3d 584, 594 (3d Cir. 2005). When the non-moving party is the plaintiff, she must "make a showing sufficient to establish the existence of [every] element essential to [her] case and on which [she] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

The various claims in these consolidated actions overlap to some extent. We will proceed by first examining Devon's claims against Itochu.[13] Then, we will examine Itochu's closely related claims against Devon for breach of the $4 million Line of Credit and the $5 million Guaranty Agreement contracts. Finally, we will examine Devon Robotics and MedSurg's claims against each other regarding the MedSurg Distribution Agreement ("MDA").

### I. DEVON'S CLAIMS AGAINST ITOCHU

A little over two years ago, this Court first assessed Devon's claims against Itochu. We determined that Devon's claims for breach of contract, fraudulent misrepresentation, breach of duty to negotiate in good faith, breach of oral contract, and promissory estoppel were potentially viable and should proceed to

---

[13] There is one exception: in Count II for Breach of Contract, Devon alleges that Itochu is liable for the breach of the MDA, and as such we reserve consideration of this claim for Part III, *infra*.

discovery. However, in tandem, we cautioned that the Court made no determination as to whether the language in the various written agreements provided a valid defense to Devon's claims. See Doc. No. 37 at n.2-4. In order to ascertain whether the claims may be sustained at this stage, we must determine whether the written agreements between the parties, now in evidence, provide Itochu with a valid defense such that Devon's claims fail as a matter of law. With this governing issue in mind, we proceed to examine each count *seriatim*.

**(1)  Breach of Oral Contract**

"Under Pennsylvania law, an agreement is enforceable as a contract only if both parties have manifested an intention to be bound by its terms, if those terms are sufficiently definite to be enforced, and if there is consideration." Fetter v. N. Amer. Alcohols, Inc., 2008 U.S. Dist. LEXIS 99855 at *14-15 (E.D. Pa. Dec. 10, 2008)(citing Blair v. Scott Specialty Gases, 283 F.3d 659, 666 (3d Cir. 1998)).[14]

---

[14] The parties do not directly clash on which jurisdiction's laws govern the breach of oral contract claims. However, both note a possible choice-of-law issue relating to whether New York or Pennsylvania law should be applied in our analysis. Some of the written agreements signed by the parties include a Pennsylvania choice-of-law provision; others include a New York choice-of-law provision. Devon does not engage in a choice-of-law analysis, explicitly argue for the application of New York law, or dispute the application of Pennsylvania law, which this Court has previously applied in regard to these claims. However, Devon does cite in passing that the November 11, 2008 Letter of Intent is governed by New York law. See Resp. at 42n.111. As Itochu points out, Devon does not purport to enforce this letter, but rather a pre-existing oral contract. In any event, we refrain from analyzing the scope of the choice-of-law provision because there is no actual conflict between the potentially applicable laws. See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007)("If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary."); Allianz Ins. Co. v. SSR Realty Advisors, Inc., 2003 U.S. Dist. LEXIS 9585 at *9 (E.D. Pa.

The question of whether a contract was formed is for the jury to decide where the facts are in dispute. <u>Quandry Solutions Inc. v. Verifone Inc.</u>, 2009 U.S. Dist. LEXIS 31459 at 16 (E.D. Pa. April 13, 2009)(quoting <u>Ingrassia Constr. Co. v. Walsh</u>, 486 A.2d 478, 482 (Pa. Super. Ct. 1984). "What was said and done by the parties as well as what was *intended* by what was said and done by them are questions of fact for the jury." <u>Solomon v. Luria</u>, 246 A.2d 435, 438 (Pa. Super. Ct. 1968)(emphasis added); <u>accord</u> <u>GMH Assocs., Inc. v. Prudential Realty Group</u>, 752 A.2d 889, 898 (Pa. Super. Ct. 2000). Given that the intent of the parties to be bound is a requisite element of contract formation, "oral contracts make it particularly difficult to extricate the matters of law from the questions of fact. Nevertheless, the allegation that an oral contract exists does *not* automatically entitle a plaintiff to a jury trial." <u>Quandry</u>, 2009 U.S. Dist. LEXIS 31459 at 17 (emphasis added). Contract formation is a matter of law ripe for determination by the Court if a binding contract could not exist under the undisputed set of facts. <u>Id</u>.

---

June 5, 2003)(counseling courts to avoid the choice of law question "where the laws of two jurisdictions would produce the same result on a particular issue."). <u>See</u> <u>also</u> <u>Amica Mut. Ins. Co. v. Fogel</u>, 656 F.3d 167, 171 (3d Cir. 2011) (applying Pennsylvania choice of law rules in diversity jurisdiction cases such as this one). There is no conflict between Pennsylvania and New York law on the present question of contract formation. <u>See, e.g.</u>, <u>RG Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 75 (2d Cir. 1984)(holding that "considerable weight" is put on parties' explicit language that they will not be bound outside of a formal written agreement); <u>Banco Espirito Santo de Investimento v. Citibank</u>, 2003 WL 23018888 at *4-5 (S.D.N.Y. Dec. 22, 2003)(dismissing breach of oral contract claim where letter of intent demonstrated defendant's 'expressed intentions' not to be bound by any statement outside the [formal agreement]"), aff'd, 110 F. Appx. 191 (2d Cir. 2004).

at 16 (quoting <u>Mountain Props., Inc. v. Tyler Hill Realty Corp.</u>, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001)). The Court must determine whether a reasonable jury, considering the parties' undisputed actions and words, could find that they formed a binding oral contract. That inquiry may be resolved at the summary judgment stage.

The party alleging the breach of an oral contract bears the burden of proving the existence of that contract with clear and precise evidence. <u>Luther v. Kia Motors Am., Inc.</u>, 676 F. Supp. 2d 408, 416 (W.D. Pa. 2009); <u>see</u> <u>also</u> <u>Mackay v. Mackay</u>, 984 A.2d 529 (Pa. Super. Ct. 2009); <u>Martin v. Safeguard Scientifics, Inc.</u>, 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998). It is not enough to show preliminary negotiations or an agreement to enter into a binding contract in the future; to succeed, the party must prove that a mutual intent to be bound manifested, even though not memorialized in writing. <u>Fetter</u>, 2008 U.S. Dist. LEXIS 99855 at *15 (citing <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 666 (3d Cir. 1998)). The absence of a formalized agreement in writing does not prevent the enforcement of an agreement where the parties agree on the essential terms; however, for this to be true, an existing, later writing must be intended as a simple formality or as evidence documenting an earlier conclusive agreement. <u>Id</u>. at *18.

37

"In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." <u>Mountain Props</u>., 767 A.2d at 1101.

**COUNT VI:  Existence of Oral Contract for the Purchase of DHS Shares by Itochu**

In Count VI, Devon asserts that two oral contracts were formed, each governing the purchase of shares in DHS by Itochu. On November 5, 2008, Devon allegedly entered into a binding oral contract with Itochu pursuant to which Itochu agreed to purchase 50% of the shares in DHS before the end of the year for $27,500,000 so long as Bennett removed the minimum quotas from the written MDA signed that same day. On December 15, 2008, a later (and apparently superseding) oral contract arose from discussions between Rabbat and Bennett. Under the terms of this oral contract, Itochu would purchase 30% of the shares in DHS for $16,500,000 with an option to purchase an additional 20% of such shares. Devon asserts extensive damages from Itochu's failure to follow through with the DHS share purchase, including damages from the lost opportunities that would have been available to Devon had the transaction proceeded.

For the purposes of the present Motion we consider the facts in the light most favorable to Plaintiffs and assume that minimum quotas for MedSurg were a part of the drafted agreement but

38

removed before the contract was signed, and that Bennett signed the MDA on November 5, 2008 despite the absence of quotas because Suzuki and Rabbat told him that they would purchase 50% shares in Devon Health and fulfill their obligations under the agreed upon 50-50 split of the costs for the robots.[15]

In addressing this matter, it is necessary to first note the troubling paradox Devon presents to this Court. While Devon's various pleadings are littered with allegations that Itochu tricked or forced Bennett into signing a distribution agreement without quotas, neither side argues that the MedSurg Distribution Agreement was invalid or fraudulently induced. In fact, Devon Robotics seeks to hold MedSurg accountable for breaching this contract, as discussed *infra* Part III. Instead, Devon argues that Bennett altered the terms of distribution contract as consideration for, and in reliance upon, a distinct oral agreement. This position appears to run afoul of the integration clause contained within the MDA, under which Bennett disclaimed reliance on external representations and agreed that the written contract comprised the entirety of the promises related to MedSurg's duties in the distribution of the robots:

This Agreement constitutes the entire understanding between the

---

[15] We make this assumption while noting that the only evidence of this oral promise by Suzuki and Rabbat is Bennett's testimony. Several other Devon Robotics personnel, and witnesses, support Bennett's contention that he spoke privately with Rabbat and Suzuki on Nov. 5th but none, not even Devon's general counsel, were present during the alleged formation of the oral contracts. There is evidence that an earlier draft of the MDA contained minimum quotas.

> parties with respect to the subject matter hereof; no other
> representations or covenants have induced either party to enter
> into this Agreement. ¶ 28.

Any attempt to contradict the terms of the written distribution agreement with contemporaneous oral statements would violate the parol evidence rule. However, this is not an issue before us as Devon does not attempt to undermine the validity of, or modify the terms within, the MDA.

Instead, Devon quite boldly asserts that its actions in executing this contract formed consideration for separate oral contracts entered into that same day in the course of private conversations with Rabbat and Suzuki. Devon attempts to enforce both the written contract without quotas and the oral contract that allegedly arose in consideration for removing those quotas. In essence, Bennett, acting on behalf of Devon Robotics, signed a valid writing that included an acknowledgement that he did not take this action on the basis of *any* representation not included in that document. Bennett's present argument that he was induced to act on the basis of promises made by Itochu thereby contradicts his own previous writings.

We are not aware of—and the parties do not cite—any case law that would bar Devon's alteration of one contract to its detriment from serving as consideration for a separate contract governing a different *quid pro quo* arrangement. However, even if Devon has established valid consideration, Devon cannot show the

40

existence of an oral contract because no reasonable jury could determine that the parties manifested a mutual intent to be bound to the DHS share purchase.

Bennett's undisputed actions after November 5, 2008 are inconsistent with his allegations that he believed he had entered into a binding legal contract with Itochu for the sale of shares in DHS. In particular, he signed and executed two written documents that explicitly contradicted this belief. Both the November 11, 2008 letter of intent and the December 19, 2008 term sheet included provisions that Itochu was not legally bound to follow through with the outlined deal. Bennett conveniently claims that the November and December 2008 documents merely support and supplement the binding oral contract.[16] He argues that these writings "buttressed and fleshed out Rabbat's prior statements, but did nothing to vitiate them." Resp. at 42. We cannot accept that a sophisticated businessman would sign a document expressly stating that a multimillion deal is not binding if that individual believed, and intended, already to be bound to the deal. Itochu explicitly communicated its intent not to be bound to such a promise. "Where one party expresses an intent not to be bound until a written contract is executed, the parties are not bound until the execution of a written contract

---

[16] Devon appears to allege in the Amended Complaint that there were two distinct oral contracts formed related to the DHS share purchase—one on November 5th and then another on December 15th. Yet, Devon has argued that there was a binding agreement for the DHS share purchase on November 5th, and the subsequent writings all served to "carry through" this binding deal.

occurs." Fetter, 2008 U.S. Dist. LEXIS 99855 at *15 (citing

Schulman v. J.P. Morgan Inc. Mgmt., Inc., 35 F.3d 799, 808 (3d

Cir. 1994)). The uncontested evidence shows that Itochu did not

view itself as bound to any promises made to Bennett to purchase

DHS shares, and that Bennett was aware of and agreed to this.

This is alone sufficient to defeat any claim that a binding

oral contract existed. However, the record includes additional

and substantial evidence that the parties did not manifest the

intent to be bound to a share purchase of DHS by Itochu. On

November 21, 2008, after the alleged oral contract, Bennett

himself wrote to Rabbat: "[W]e need to reestablish the capital

needs of newco...I am prepared *with the closing on DHS* to

contribute 8 million usd. This will leave a requirement for

[Itochu] to fund an additional 4 million usd." Ex. D at

III017_0016295 (emphasis added). Then on December 11, 2008,

Bennett again acknowledged that the deal for the purchase of DHS

shares had not been solidified:

> I need a hard date for closing the dhs deal...I need a date
> certain. Can you provide that for me? I don't want a target date
> but a drop dead date with an itochu penalty. We have shoke hands
> many times but we have not had any resolution. I must meet with
> you when you are available. We need to be on the same page with
> writings to concur our mutual agreements. Ex. I at Devon0073432.

Moreover, Bennett had signed similar documents in the past,

and does not argue that those documents legally bound Itochu to

follow through with the share purchase. Both the July 2007 and

June 2008 letters of intent are flush with references to future

execution and delivery of definitive transaction documents and a
closing. In unequivocal terms, these documents declare: "Nothing
set forth in this letter shall give rise to a binding obligation
on the part of ITOCHU with respect to the terms, negotiation, or
consummation of the Proposed Transaction. Any such binding
obligation will arise solely upon the executive and delivery by
the parties of the Definitive Transaction Documents." Def. Mot.
Ex. A. "Binding obligations shall only arise through the
execution of definitive agreements expressing a clear and express
intention to be bound in accordance with the terms thereof." Id.
at Ex. L. These earlier letters also state that Itochu's board of
directors would have to approve the proposed transaction. Each
time Bennett signed on behalf of DHS, indicating that he
understood, accepted and agreed to these terms. We acknowledge
that "[w]here a requirement is contained in a former contract,
the parties may waive the requirement by a later oral
modification of the former contract...even where the written
contract contains language prohibiting oral modifications." See
MDNet, Inc. v. Pharmacia Corp., 147 F. Appx. 239, 243-44 (3d Cir.
2005). However, Devon does not make such an allegation, and in
light of the other evidence already discussed, it would fail to
save these claims.

Even accepting Bennett's allegation that Itochu promised to
purchase DHS shares, the clear language of two signed writings

contradict his claim that Itochu was bound to do so. These actions, taken within days of the alleged oral agreement, undercut any claim that the parties intended to be bound to the DHS share purchase.[17]

## COUNT VII: Existence of Oral Contract to Split Costs of CytoCare and i.v. Station Investment Ventures

Count VII asserts that Itochu entered into an oral contract with Bennett and Devon Robotics to be a 50/50 partner and investor with respect to the CytoCare and i.v. Station ventures pursuant to which Itochu agreed to share in all research and development fees, licensing fees and capital expenses in exchange for its subsidiary, MedSurg, having distribution rights. Itochu never provided Devon with this promised funding despite the fact

---

[17] Devon would have us confine our analysis to Teachers Insurance & Annuity Assoc. v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y. 1987), which was followed by the Third Circuit when applying New York law in Trianco, LLC v. IBM, 347 F. Appx. 808 (3d Cir. 2009)(non-precedential). In fact, Devon relies almost entirely on Tribune for its proposition that there was a binding oral contract between the parties that Itochu subsequently breached. In Tribune, an institutional lender and a prospective borrower both signed a written "commitment letter" that expressly stated that the act of signing would result in a "binding agreement" to borrow and lend on the agreed terms, subject to the preparation and execution of final documents. 670 F. Supp. at 499. The letter also left open some terms of the deal, and asserted that the deal required final approval from the board. The court determined that the parties were bound to negotiate in good faith. Here, in stark contrast, the written documents signed by the parties say the exact opposite. Every single document includes an explicit provision that it is non-binding and that binding obligations would only arise if a final, definitive and written agreement were signed. This difference is dispositive. We need not engage in an analysis under the Tribune factors because there is no manifestation of intent to be bound to an agreement in the writings before us. Likewise, we need not revisit our prior choice-of-law analysis on the basis of Devon's citation to this non-applicable New York legal principle. Furthermore, even in Tribune, the court recognized that the parties were not bound to the "ultimate contractual objective" as a contract had not been reached. Id. at 498. Rather, the parties had only obligated themselves to negotiate in good faith in an attempt to solidify the agreement. Consequently the Tribune analysis is inapplicable to Plaintiffs' breach of oral contract claim, which by definition seeks to hold Itochu to the "ultimate contract objective."

that Devon provided MedSurg with distribution rights on November 5, 2008.

Devon does not specify the precise point in time at which this binding oral contract manifested. We are also uncertain precisely what constituted the consideration for this alleged oral contract—whether providing MedSurg with distribution rights or more specifically removing the quotas from the MDA on November 5th. In the Complaint, Devon asserts: "Bennett and Devon Robotics performed their obligations under the contracts and provided Medsurg the rights to distribute CytoCare pursuant to the November 5, 2008 Distribution Agreement." However, in its arguments, Devon conflates its oral contract claims and repeatedly references the removal of quotas from the MDA. Nowhere does the fully integrated MDA mention Itochu's promise to fund the robotics venture. In either event, Devon's claim fails as a matter of law.

A plaintiff's belief, based on representations from the company itself, that additional approvals are mere formalities, albeit necessary ones, for final execution of the deal belies the existence of an oral contract between the parties prior to the completion of this approval process. Luther, 676 F. Supp. 2d at 418. Like the present case, Luther involved a multi-step process for corporate approval of a deal, and the plaintiff was aware of that process. In Luther, parties discussed plaintiff becoming a

45

Kia vehicle franchisee for several months. Plaintiff provided confidential information to Kia related to his other dealerships and his personal finances. Based on a formal application he submitted in this process, the plaintiff understood that Kia's national office would have to approve the deal. However, a Kia representative later told him that the decision had been made to choose him as a franchisee and that approval from the national office was only a formality. He was also told that in the past approval from the regional office meant success at the national office. The plaintiff argued that Kia had breached an oral contract to grant him a Kia franchise despite his fulfillment of all the prerequisite obligations.

Yet, the court in <u>Luther</u> rejected plaintiff's claim against Kia for breach of oral contract at the summary judgment stage. According to plaintiff's own testimony, under the terms of the alleged oral contract, as he understood them, approval from the national office was necessary, even if only a formality. <u>Id</u>.

The undisputed facts of this case compel the same result. We acknowledge that the record is replete with communications from Rabbat referencing his promises to share in the investment venture. But, according to Bennett himself, the terms of the alleged contract included a provision that the deal would be approved by the Itochu investment committee. By Bennett's own understanding, approval was needed to solidify a binding deal.

46

While he may have been led to believe that approval was certain
to be given based on Rabbat's representations, no reasonable
juror could extract from this a mutual intent to be bound prior
to the completion of the necessary approval process. Even if
Rabbat represented that the investment committee would approve
the deal, Bennett was aware that this formality was required to
bind the company.[18]

  We then consider whether there is a genuine factual dispute
regarding whether Itochu gave the requisite corporate approval of
this deal. Rabbat did represent to Bennett, along with DeViedma,
that the investment committee had approved the Newco deal
(outlined in the September 8, 2008 letter) except for provisions
relating to HRNA's role. But, there is no evidence from which a
reasonable jury could determine that Itochu had formally approved
the robotics deal *before* Bennett signed the distribution
agreements with HRSRL. Furthermore, the Newco deal was never
executed, and Devon does not attempt to enforce this written
document. Rather, Devon alleges that a superseding oral agreement
to split all costs of the robot investment, apart from the

_____

[18] Bennett points out that MedSurg had entered into the June 2008 transaction
with HRNA without Investment Committee approval. See Email from Bennett to
Rabbat (Oct. 4, 2008), Ex. I at Devon0112249. Rabbat concurs. While Itochu is
a separate entity, Rabbat spoke on behalf of both entities, and the
delineations appear uncertain. But nothing in the record suggests, even in the
light most favorable to Plaintiffs, that Bennett was told approval for the
robotics investment would mirror approval for the HRNA-MedSurg CytoCare
Distribution Agreement. Bennett drew this inference on his own. It is
uncontested that Bennett understood that the Itochu Investment Committee was
led by Suzuki and Rabbat, and that this Committee determined approval of
Itochu's transactions.

November 5th contracts, existed. There is no evidence that the Itochu investment committee approved such a deal.

We reject Devon's assertions that the proposal to work out an arrangement between the companies related to these two robots, even if cloaked in the good intentions and promises of Rabbat, and the parties continued efforts towards this end somehow, formed a binding contractual agreement that Devon can now enforce. Furthermore, the parties' own undisputed actions show that Devon was aware that Itochu did not consider itself bound and had not yet solidified a contract to share in Devon Robotics. For example, the Loan & Security Agreement signed by Bennett in November 2008 included a Call Option under which Itochu would "have the right, but not the obligation, to purchase one-half (1/2) of the membership interests in [Devon Robotics]" Def. Mot. Ex. U at 4. This call option disproves the assertion that Itochu bore an affirmative obligation to pay half of the development fees for i.v. Station.

A juror would have to ignore the language of several writings—none of which Bennett denies signing—and determine that the parties manifested a mutual intent to be bound to an agreement made in the course of a conversation that included terms not laid out in any writing. A reasonable juror could not come to this conclusion. Finding no genuine disputes of material fact regarding the alleged existence of an oral contract between

the parties, we grant Itochu's Motion for Summary Judgment on Counts VI and VII for Breach of Oral Contract and dismiss these claims.

### (2) Promissory Estoppel[19]

A claim for promissory estoppel requires that the plaintiff show that (1) the defendant made a promise that he should have reasonably expected to induce the plaintiff to act or refrain from acting, (2) the plaintiff actually relied on the promise and either took, or refrained from taking, action, and (3) enforcing the promise is the only way to avoid injustice. Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000); see also Burton Imaging Group v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 438-39. "Satisfaction of the requirement that enforcement must be necessary to avoid injustice "may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, [and] on the formality with which the promise is made." Rapid Circuits, Inc. v. Sun Nat'l Bank, 2011 U.S. Dist. LEXIS 47231 at *62 (E.D. Pa. May 2, 2011)(quoting Thatcher's Drug Store v. Consolidated Supermarkets, 636 A.2d 156, 160 (Pa. 1994)(citing Restatement (Second) of Contracts §90, cmt. b)).

---

[19] Because both parties cite Pennsylvania law and have not identified any choice-of-law issues, this Court will apply Pennsylvania law. See Austin Power Co. v. Popple Constr., Inc., 167 Fed. Appx. 931, 934n.1 (3d Cir. 2006) (applying Pennsylvania law where the parties did not address which law applied to an agreement but cited only Third Circuit and Pennsylvania law); ISObunkers, L.L.C. v. Easton Coach Co., 2010 U.S. Dist. LEXIS 11201 (E.D. Pa. Feb. 8, 2010).

**Count VIII: Promissory Estoppel to Enforce Itochu's Promise to Purchase Shares in DHS**

In Count VIII, Plaintiffs claim that they entered into a Share Purchase Agreement with HRSRL with the expectation that Bennett could fund this deal with the money received from Itochu's purchase of shares of DHS. Bennett, acting for DHS and Devon Robotics, asserts that he reasonably relied on the promises made by Itochu on November 5, 2008 and December 15, 2008, and thus can hold Itochu liable under a theory of promissory estoppel. However, it is unreasonable as a matter of law to rely on an oral statement that is contradicted by a signed writing. Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs., 951 F.2d 1399, 1412 (3d Cir. 1991); Blue Mt. Mushroom Co. v. Monterey Mushroom, 246 F. Supp. 2d 394, 406 (E.D. Pa. 2005). It is not justifiable for sophisticated businesspeople to rely on an informal handshake or spoken promise to do something that a formal agreement gives one party the right not to do. As previously discussed, both the November 11, 2008 Letter of Intent and the December 17, 2008 Term Sheet were expressly non-binding, as were the previous June 2007 and July 2008 Letters of Intent. It was unreasonable as a matter of law for Devon to rely on Itochu's oral promise to purchase DHS shares as this statement contradicted several signed written documents under which such a transaction required the execution of a final, binding, *written* contract.

50

**COUNT IX: Promissory Estoppel to Enforce Itochu's Promise to Share in Robotics Venture**

In Count IX, Plaintiffs claim that they entered into agreements with HRSRL for the rights to i.v. Station and CytoCare in reasonable reliance on Itochu's promise to be an equal partner in this venture, including sharing the expenses related to research and development fees and working capital expenses.

We accept as true for our current purposes that Rabbat promised Bennett that Itochu would join with him in the investment scheme, sharing equally the costs of acquiring the rights to i.v. Station and CytoCare.[20] Moreover, Rabbat made this promise to induce Bennett to acquire distribution rights from HRSRL as a placeholder for MedSurg. In contrast to the DHS share purchase deal, at the time Bennett executed an agreement with HRSRL for the distribution rights to i.v.Station in August 2008, there were no signed writings between the parties related to the robotics investment venture.

Devon maintains that the various conversations between the parties in the record necessarily create a genuine dispute over material facts for a fact-finder. However, after a careful review of the record, we can only conclude that Bennett's actions do not amount to reasonable reliance.

---

[20] Whether Rabbat made a sufficiently clear and specific *promise*, whether Rabbat should have reasonably expected his representations to induce Bennett's action, and whether Rabbat's promises were in fact what induced Bennett to act all remain disputed questions of fact.

"A claim for estoppel cannot survive when the plaintiff's actions were based on "his own will and judgment" rather than the defendant's representations." <u>Luther</u>, 676 F. Supp. 2d at 422 (citing <u>Josephs v. Pizza Hut of America, Inc.</u>, 733 F. Supp. 222, 227 (W.D. Pa. 1989), aff'd 899 F.2d 1217 (3d Cir. 1990). "[B]usinesses may not rely merely on their own interpretation of the legal significance of a promise." <u>Burton</u>, 502 F. Supp. 2d at 439. "Action induced by the promisee's mistaken judgment will not satisfy this element of detrimental reliance because such reliance is not reasonable." <u>Id</u>.

Like the plaintiffs in <u>Josephs</u> and <u>Burton</u>, Bennett acted on his own belief—or "business hunch"—that Itochu would join him in the investment scheme if he secured the rights to CytoCare and i.v. Station. Bennett did not act reasonably when he determined that Rabbat's promise was legally significant and binding and relied upon this promise alone when incurring liability under the HRSRL contracts. The interest of justice does not require this Court to enforce the alleged promise as any reliance by Bennett was unreasonable as a matter of law. <u>See</u> <u>Blue Mt. Mushroom Co.</u>, 246 F. Supp. 2d at 407.

Furthermore, promissory estoppel is inappropriate in this case because of the presence of enforceable, written contracts governing contributions of Itochu and MedSurg to the robotics investment venture. We have determined that the contracts signed

52

by the parties on November 5, 2008 are all binding legal
agreements that, by their plain language, govern the parties'
commitments to one another regarding the robotics investment
venture. "Under Pennsylvania law, an enforceable contract between
two parties precludes relief for a claim of promissory estoppel."
ISObunkers, 2010 U.S. Dist. LEXIS 11201 at *13 (citing Carlson v.
Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990)).
Moreover, "promissory estoppel should not be used to supplement
or modify a written, enforceable contract." Tomlinson v.
Checkpoint Sys., Inc., 2008 U.S. Dist. LEXIS 5463 at *17 (E.D.
Pa. Jan. 23, 2008). This doctrine "is not designed to protect
parties who do not adequately memorialize their contracts in
writing." Iversen Baking Co., Inc. v. Weston Foods, 874 F. Supp.
96, 102 (E.D. Pa. 1995). "Thus, by definition, a promissory
estoppel claim can survive only where a contract is absent."
Tomlinson, 2008 U.S. Dist. LEXIS 5463 at 17 (citing Iversen
Baking Co., 874 F. Supp. at 102). As such, it is inappropriate to
apply the doctrine of promissory estoppel. See Kump v. State Farm
Fire & Cas. Co., 2012 U.S. Dist. LEXIS 47458 at *8-9 (M.D. Pa.
Apr. 3, 2012), Carlson, 918 F.2d at 416.

     Finally, we note that our holding remains the same if Devon
is in fact arguing that the removal of quotas from the MDA was
consideration for the exchange of promises between the parties.
"[P]romissory estoppel is applied to enforce a promise *not*

supported by consideration." <u>MDNet</u>, 147 F. Appx. at 244 (emphasis added).

For the reasons discussed, we grant Itochu's Motion for Summary Judgment on Counts VII and IX for Promissory Estoppel, and dismiss these claims.

**(3)  Fraudulent Misrepresentation**

In Count III, Devon alleges a claim of fraudulent misrepresentation against Itochu, Rabbat and Suzuki on the basis of several distinct representations made by these Defendants, each of which Devon claims to have reasonably, and detrimentally, relied upon.

As a preliminary matter, we address Itochu's argument that Devon's claim for false misrepresentation is barred under the Pennsylvania "gist of the action" doctrine. This doctrine "operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims." <u>Hart v. Arnold</u>, 884 A.2d 316, 339 (Pa. Super. Ct. 2005).  The gist of the action doctrine bars tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." <u>Brown & Brown, Inc. v. Cola</u>, 745 F. Supp. 2d 588, 619-620 (E.D. Pa. 2010)(quoting

54

<u>Sunburst Paper, LLC v. Keating Fibre Int'l, Inc.</u>, 2006 U.S. Dist. LEXIS 78890 at *5 (E.D. Pa. Oct. 30, 2006)).[21]

The gist of the action doctrine does not apply in this case to bar Devon's claim for fraudulent misrepresentation. In the absence of a contract, misrepresentations made by one party to the other are not barred under Pennsylvania's gist of the action doctrine because any duty to refrain from misrepresentations in such circumstances stems from social policy and is not created by virtue of contract. <u>See</u> <u>Blue Mt. Mushroom Co.</u>, 246 F. Supp. 2d at 404n.7. Itochu disavows any contract with Devon to share in the sale of the robots, or to follow through with the DHS share purchase. As discussed *supra*, we agree that as a matter of law no oral contracts existed between the parties.[22] Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001)(quoting <u>Pegram v. Herdrich</u>, 530 U.S. 211, 227 (2000)).[23]

---

[21] "Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts have predicted that it will." <u>Brown & Brown, Inc.</u>, 745 F. Supp. 2d at 619n.11.

[22] It is not clear how-and Itochu does not directly argue-other contracts between the parties foreclose this claim.

[23] However, this claim is barred under the gist of the action doctrine to the extent that it seeks to remedy MedSurg's failure to adequately perform under the MDA.

To establish a fraudulent misrepresentation claim, a plaintiff must allege (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as a proximate cause. Petruska v. Gannon Univ., 462 F.3d 294, 310 (3d Cir. 2006); Viquers v. Phillip Morris USA, Inc., 837 A.2d 534, 540 (Pa. Super. Ct. 2003)(explaining that the false statement must be made "with knowledge of its falsity or recklessness as to whether it is true or false"). The recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely. Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 207 (Pa. 2007) (citing Merritz v. Circelli, 64 A.2d 796, 798 (Pa. 1949)). "In determining whether reliance is reasonable, the degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors." McCloskey v. NovaStar Mortg., Inc., 2007 U.S. Dist. LEXIS 62297 at *27-35 (E.D. Pa. Aug. 21, 2007).

Generally, promises to perform future acts cannot constitute fraud because fraud must be premised on a misrepresentation as to a present or past fact. Mellon Bank Corp., 951 F.2d at 1409. "It is well-established that a cause of action for fraud must allege a misrepresentation of a past or present material fact." Krause

56

v. Great Lakes Holdings, Inc., 563 A.2d 1182, 1187 (Pa. Super.
Ct. 1989). However, statements of present intention may
constitute fraudulent misrepresentations of fact if the
statements were known to be false when uttered. Mellon Bank
Corp., 951 F.2d at 1410; see also Phoenix Techs., Inc. v. TRW,
Inc., 834 F. Supp. 148, 152 (E.D. Pa. 1993). "Statements of
intention made at the time of contracting are not fraudulent
simply because of a later change of mind." Giordano v. Claudio,
714 F. Supp. 2d 508, 519 (E.D. Pa. 2010)(citations omitted).
Thus, to prove a lack of present intent, plaintiff needs to prove
*more* than mere non-performance.

Devon's claim for fraudulent misrepresentation is based on a
series of promises to do future acts (the same promises upon
which Devon bases its promissory estoppel claims), and as such
Devon must identify evidence to show a factual dispute as to
whether "the individual making the statement ha[d] no intention
of performing at the time the promise to do so [was] made."
Giordano, 714 F. Supp. 2d at 519.

### (a)  *Representations Regarding Robotics Investment*

Devon Robotics entered into an agreement with HRSRL to pay
all research and development expenses associated with i.v.
Station in exchange for the distribution license to the robot.
Devon Robotics claims that they acted in reliance on Rabbat's
representation that Itochu would become a fifty percent partner

and investor in a joint business with Devon Robotics that would
in turn distribute i.v.Station. This never happened and Devon
Robotics asserts that Rabbat's representations of the potential
deal were false. The same situation occurred with regard to the
sale of Cytocare. Rabbat advised Bennett that Itochu would enter
an agreement with Devon Robotics whereby Itochu would be a fifty
percent partner in the sale and distribution of CytoCare. In
reliance on these representations, Devon Robotics went ahead and
entered into agreements with HRSRL for the distribution rights to
these robots and thus took on significant financial obligations
by way of these contracts.

There is no evidence that Rabbat knew or should have known
that the partnership would not ultimately manifest when he made
these representations to Bennett in August and September 2008. On
the contrary, the record reflects Rabbat's efforts to submit the
deal to Itochu for final approval, and his belief that such
approval would be granted. Furthermore, for the reasons already
discussed, Bennett's reliance on Rabbat's representations that
Itochu would share in the costs, despite knowing that this
required investment committee approval, was not justified.

### (b) *Representations Regarding DHS Share Purchase*

Devon points to alleged discussions that took place on
November 5, 2008 between Bennett, Rabbat and Suzuki. Devon claims
that both Rabbat and Suzuki misrepresented to Bennett that in

58

consideration of Bennett agreeing on behalf of Devon Robotics to remove any binding quotas or minimum purchase obligations from the MDA, Itochu would proceed with the 50% share purchase of DHS before the end of the year, and would cover any losses to Devon Robotics if MedSurg failed to sell enough robots. Devon claims that at this time both Rabbat and Suzuki knew or reasonably should have known that these representations were material false statements. Devon makes a similar claim that on December 15, 2008 Rabbat misrepresented to him that Itochu's share purchase of DHS would proceed under certain modified terms in early January 2009. Based on this alleged misrepresentation, Devon Robotics paid a €5 million non-refundable deposit to HRSRL on December 26, 2008.

It appears to the Court that Bennett, versed in business dealings, cannot establish that he reasonably relied upon promises to act while simultaneously signing documents that acknowledge the mutual intent of the parties not to be legally bound to such promises. See MDNet, 147 F. Appx. at 245 (affirming dismissal of fraud claim because "no party could justifiably rely on an oral promise foreclosed by the requirement that a subsequent agreement be in writing"). As a matter of law, sophisticated parties represented by counsel cannot justifiably rely on alleged misrepresentations that are contradicted by written agreements. Blue Mt. Mushroom Co., 246 F. Supp. 2d at 405. If Devon believed that Itochu's responsibility to cover any

losses was crucial to the transactions between the parties, then it should have been included in at least one of the November 5th contracts. See id. (rejecting reliance on a representation about the structure of the party's financing where the written sale agreement did not address this but did include an integration clause).

For the reasons discussed, we grant Itochu's Motion for Summary Judgment on Count III for Fraudulent Misrepresentation, and dismiss this claim.

**(4) Duty to Negotiate in Good Faith**

In Count V of its Amended Complaint, Devon asserts that Itochu, acting through its authorized representatives Rabbat and Suzuki, breached its duty to negotiate in good faith in multiple ways: inducing Devon Robotics to enter into an agreement with HRNA; failing to close a transaction such that Itochu and Devon Robotics would be 50-50 owners of a company with distribution rights to both i.v. Station and CytoCare; inducing Devon Robotics to enter into the MDA; failing to close the DHS share purchase despite assurances; and, otherwise misleading Bennett, DHS and Devon Robotics as to their intentions.

A "duty to negotiate in good faith" requires a binding agreement between the parties expressing their commitment to negotiate together in good faith to reach a final agreement. Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795

F.2d 291, 299 (3d Cir. 1986). This duty must be founded on an express and unequivocal promise that is definite enough to be enforced. <u>Milandco Ltd. v. Wash. Capital Corp</u>., 2001 WL 1609424 at *5-6 (E.D. Pa. Dec. 12, 2001). Under Pennsylvania law, an agreement to negotiate in good faith must meet all of the requisite elements of a contract: (1) both parties manifest an intention to be bound by the agreement; (2) the terms are sufficiently definite to be enforced; and (3) consideration was conferred. <u>Channel Home Ctrs</u>., 795 F.2d at 299; <u>Flight Sys., Inc. v. Elec. Data Sys. Corp</u>., 112 F.3d 124, 130 (3d Cir. 1997).

Itochu argues that Devon does not-and cannot-identify any specific promise to negotiate in good faith, a requisite element of its claim. We agree. There is no evidence-beyond Bennett's own uncorroborated and conclusory assertions-that anyone from Itochu made any such a binding, definitive promise. <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Schoch</u>, 912 F.2d at 657. For this reason, there is no dispute for the fact finder and the Court grants Itochu's Motion for Summary Judgment on Count V for Breach of Duty to Negotiate in Good Faith and dismisses this claim.

## II. ITOCHU'S CLAIMS FOR BREACH OF CONTRACT AGAINST DEVON ROBOTICS[24]

To prove a breach of contract under New York law, the plaintiff must show "(1) a contract; (2) performance of the

---

[24] Citations to the record in regards to these claims are made to the exhibits attached to Itochu's Motion in Case No. 09-CV-4123, Doc. No. 81, unless otherwise indicated.

contract by one party; (3) breach by the other party; and (4) damages." <u>Bank of America, N.A. v. Vengest, Ltd</u>., 2011 U.S. Dist. LEXIS 2502 at *4 (S.D.N.Y. Jan. 11, 2011). When the language of a contract is clear and unambiguous, interpretation of the contract "is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." <u>Omni Quart v. CVS Corp</u>., 287 F.3d 61, 65 (2d Cir. 2002). Contract language is unambiguous "when it has a 'definite and precise' meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." <u>E2Capital Investment Ltd. v. Auerbach, Pollack, and Richardson, Inc.</u>, 2003 U.S. Dist. LEXIS 4318 at * 13-14 (S.D.N.Y. Mar. 18, 2003)(quoting <u>John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp</u>., 22 F.3d 458, 461 (2d Cir. 1994)). Whether the contract language meets this definition is a question of law also appropriately resolved by the Court. <u>John Hancock Mutual Life Ins. Co.</u>, 22 F.3d at 461.

The parties do not dispute that they executed two contracts on November 5, 2008, pursuant to which Itochu agreed to loan $4 million to Devon Robotics and to arrange a $5 million Letter of Credit on Devon Robotics' behalf.[24] Moreover, there is no dispute

---

[24] These contracts expressly provide that they are governed by, and are to be interpreted in accordance with, New York law. Pennsylvania courts "honor the intent of contracting parties and enforce choice of law provisions in contracts executed by them." <u>AMG Nat'l Trust Bank v. Ries</u>, 2007 U.S. Dist. LEXIS 68083, *17 (E.D. Pa. Sept. 13, 2007), aff'd in part and remanded in part on other grounds, 319 F. Appx. 90 (3d Cir. 2008). Devon does not challenge the application of New York law in the interpretation of these specific contracts.

that Devon Robotics received $4 million from Itochu on November 7, 2008. See Exs. E at 37:17-21; F at 120:6-122:3; I and J. Likewise, the parties acknowledge that Itochu issued a $5 million letter of credit in favor of HRSRL that same day, which HRSRL drew down in its entirety on or around March 30, 2009. Exs. D; E at 52:20-23. Finally, Devon admits that it has not made any repayments to Itochu under either of these lines of credit. See Exs. E at 46:4-10, 61:7-10; F at 127:23-128:8, 139:10-22. Devon failed to make required interest payments on the $4 million Line of Credit and then defaulted on repayment of the principal when due. Similarly, Devon Robotics, along with DHS and Bennett personally, failed to repay Itochu pursuant to the terms of the $5 million Guaranty.

According to Itochu, Devon has thereby failed to perform under the plain language of both contracts, and Itochu is entitled to damages for Devon's breaches in the amounts loaned to Devon and never repaid, plus interest. In response, Devon denies it is obligated to make payments to Itochu pursuant to these agreements.

Devon employs two slightly different approaches to escaping liability under these contracts, neither of which we find convincing. First, Devon argues that its obligations under these contracts were contingent on Itochu following through with a larger transaction. According to Devon, these amounts were an

63

advancement of funds toward fulfilling Itochu's commitment to the robotics investment venture, and the enforcement of the terms must be determined within this context. But, this ignores the clear and unambiguous language of the written agreements, including the merger clauses in each contract that prevent Devon from challenging its obligations with such parol evidence.

### (1) *Devon's Obligations under the Loan & Security Agreement*

By the Agreement's terms, Itochu, as lender, agreed to extend to Devon Robotics, as borrower, a committed revolving line of credit in the amount of $4 million. In support of each loan under this Line of Credit, Devon Robotics was required to execute a written Promissory Note. The Line of Credit, and each loan, was subject to the terms of the Agreement. Finally, Devon Robotics agreed to pay an additional $300,000 to Itochu for the advance down payment Itochu had previously paid to HRSRL on Devon Robotics' behalf. In executing the document, Devon Robotics agreed that both the Agreement and the Notes, when issued, were "valid and legally binding obligations," and that Devon Robotics' liability would be "absolute and unconditional, without regard to the liability of any other party hereto." Exs. A at 2; B at 2.

The money was lent to Devon Robotics with the express expectation of repayment. Devon Robotics pledged a security interest in its assets as collateral "to secure the full and timely performance and repayment" of any loans under the Line of

Credit. Moreover, the Agreement outlined events of default, which include nonpayment of any amount due on the loans. Devon Robotics chose to max out this line of credit by borrowing $4 million shortly after the Agreement was signed. Under the Promissory Note for this loan, Devon Robotics agreed to repay the principal by December 30, 2009, and to pay accrued interest on any outstanding balance each month to Itochu, starting at the end of December 2008. Any amendments, modifications, waivers or terminations of any provision of the Agreement or accompanying Note needed to be in writing and signed by Itochu. See Ex. A at 6; Ex. B at 2.

It is also clear as a matter of law that Itochu was entitled to seek the entire unpaid amount upon Devon Robotics' default. Under the Agreement, if any Event of Default was not cured within the applicable cure period, "Lender may, without demand or notice of any kind, declare some or all of the entire unpaid and outstanding principal balance of the Loans, along with all accrued interest and fees to be immediately due and payable." Ex. A at 5; see also Ex. B at 2.

### (2) Devon's Obligations under the Guaranty Agreement[25]

Under the terms of the Guaranty, Devon "unconditionally guarantee[d]" to "duly and punctually" repay Itochu if HRSRL

---

[25] "Guaranty agreements are to be construed under ordinary principles of contract construction." HSH Nordbank AG N.Y. Branch v. Swerdlow, 672 F. Supp. 2d 409, 417 (S.D.N.Y. 2009). Here, Bennett executed this agreement, signing on behalf of himself individually and on behalf of DHS and Devon Robotics as their principal.

properly effected a draw on the $5 million Letter of Credit. Ex. C at ¶ 1.1. Devon agreed to pay Itochu "on demand" and with interest. Id. at ¶ 1.3. Once the obligation to pay the guaranteed amount arose, Devon had sixty days from Itochu's written demand to pay Itochu the owed amount. Id. at ¶ 2.1. The Guaranty Agreement further provided that "no course of dealing between [Itochu] and [Devon] shall be effective to change or modify" its terms; the Guaranty could only be modified with the written consent of all parties. Id. at ¶ 3.6. The Guarantors' liability was deemed joint and several, and "absolute and unconditional." Id. at ¶ 1.2.

### (3) Merger Clause

Devon Robotics may not undermine its unambiguous obligations by introducing contradictory parol evidence. Both the Loan & Security Agreement and the Guaranty contain merger clauses:

> This Agreement and the Notes contain the entire agreement between the parties relating to the subject matter hereof and supersede all oral statements and prior writings with respect thereto. Ex. A at 6.

> This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, negotiations, representations and proposals written or oral, relating to its subject matter. This instrument is executed and given in addition to, and not in substitution, reduction, replacement or satisfaction of, any other endorsements or guarantees of the Obligations, now existing or hereafter executed, by the Guarantor or others in Itochu's favor. Id. at ¶ 3.3.

"The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict

the terms of the writing. The merger clause accomplishes this purpose by evincing the parties' intent that the agreement is to be considered a completely integrated writing." Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 669 (N.Y. 2001)(citations omitted); Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008)(citing Primex Int'l Corp. v. Wal-Mart Stores, Inc., 679 N.E.2d 624, 657 (N.Y. 1997)). To protect against "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract," New York courts have maintained a 'heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties.'" Caisse Nationale De Credit Agricole v. Valcorp, Inc., 1992 U.S. Dist. LEXIS 14047 at *16 (S.D.N.Y. Sept. 17, 1992)(citations omitted). Furthermore, where a note is guaranteed as "absolute and unconditional," "the alleged misrepresentation that the lender would provide additional funding does not excuse the guarantor's absolute and unconditional obligation to answer for the borrower's debt." Rabb v. 257 West 21st Street Assocs., Inc., 1995 U.S. Dist. LEXIS 5109 at 6 (S.D.N.Y. April 17, 1995). Nothing in the written documents suggest that Devon's obligations to repay the $4 million loan or the $5 million credit to HRSRL are somehow contingent on the culmination of a larger transaction between the parties. By their respective terms, the contracts

contain the entire agreements relating to the terms of repayment,
irrespective of additional or later promises made to support
Devon. See E2Capital, 2003 U.S. Dist. LEXIS 4318 (S.D.N.Y. Mar.
18, 2003). _____

### *(4) Fraud Defense*

To circumvent this, Devon puts forth a second argument:
Devon entered into these contracts based on Itochu's fraudulent
misrepresentations that it intended to acquire equity in Devon
Robotics and DHS, thereby further contributing to the robotics
investment venture. Thus, Devon seeks to escape liability for its
obligations to repay Itochu under a fraud defense.

Under New York law, the admissibility of parol evidence to
prove fraud in the inducement is well-settled:

> The parol evidence rule forbids proof of extrinsic evidence to
> contradict or vary the terms of a written instrument and,
> accordingly, one who seeks in a breach of contract action, to
> *enforce* an oral representation or promise relating to the subject
> matter of the contract cannot succeed. However, the parol
> evidence rule has no application in a suit brought to *rescind* a
> contract on the ground of fraud. In such a case, it is clear,
> evidence of the assertedly fraudulent oral misrepresentation may
> be introduced to avoid the agreement. Sabo v. Delman, 143 N.E. 2d
> 906, 908 (N.Y. 1957).

As such, "a general merger clause is ineffective to exclude parol
evidence to show fraud in inducing the contract." Danann Realty
Corp. v. Harris, 157 N.E. 2d 597, 599 (N.Y. 1959). This remains
true "even if the disputed contract contains a standard merger
clause stating that the signatories acknowledge the written
document supersedes all prior agreements and constitutes the sole

68

embodiment of their obligations." <u>Lucas v. Oxigene</u>, 1995 U.S. Dist. LEXIS 12575 at *9 (S.D.N.Y. 1995). Thus, Devon seeks to introduce its long history with Itochu to demonstrate that it was misled into signing both the Guaranty Agreement and the Loan & Security Agreement.

However, "parol evidence is only admitted to show fraud where it demonstrates 'the intention of the parties that the entire contract was to be a nullity, not...that only certain provisions of the agreement were not be enforced.'" <u>Caisse Nationale</u>, 1992 U.S. Dist. LEXIS 14047 at *21 (quoting <u>Bersani v. Gen. Accident Fire & Life Assurance Corp</u>., 330 N.E.2d 68, 71 (N.Y. 1975)). "As a matter of public policy, New York courts have refused to reform a promissory note to eliminate a borrower's repayment obligation where the borrower alleges an oral understanding between the borrower and the lender that the promissory note would not be enforced against the borrower." <u>Id</u>. at 22. As in <u>Caisse Nationale</u>, Devon impermissibly attempts to offer parol evidence that would modify the enforcement provisions of the written loan documents, but not void the loan itself. Devon's attempt to void only certain provisions of the contracts with parol evidence is foreclosed as a matter of law.

The parties further dispute whether Devon may introduce parol evidence to void the contracts in their entirety pursuant to the <u>Danann</u> rule, as extended by <u>Citibank v. Plapinger</u>, 485

69

N.E.2d 974 (N.Y. 1985). Under this line of cases, even if a merger clause is too general to bar the admission of evidence to demonstrate fraud, such evidence cannot be introduced if the party has specifically disclaimed its reliance on the particular representations upon which the party bases its fraud defense. The nexus between the alleged misrepresentation and the disclaimer need not be precise. Rather, "[t]he <u>Danann</u> rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, notwithstanding semantical discrepancies." <u>Grumman Allied Indus., Inc. v. Rohr Indus. Inc.</u>, 748 F.2d 729, 735 (2d Cir. 1984). "However, specificity remains the touchstone of this analysis." <u>Mfrs. Hanover Trust Co. v. Yanakas</u>, 7 F.3d 310, 316 (2d Cir. 1993); <u>see also Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.</u>, 676 F. Supp. 2d 100, 112 (E.D.N.Y. 2009); <u>JP Morgan Chase Bank v. Liberty Mut. Ins. Co.</u>, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002); <u>ITT Indus., Inc. v. Wastecorp. Inc.</u>, 87 F. Appx. 287 (3d Cir. 2004). Finally, a sophisticated party's written assurance that performance is "absolute and unconditional" irrespective of defenses forecloses a later defense that in fact performance was conditioned on an oral promise or representation. <u>Plapinger</u>,485 N.E.2d at 976-977 ("It is unrealistic...to expect an express stipulation that defendants were not relying on a separate oral agreement to fund an additional multimillion dollar line of credit when they

themselves have denominated their obligation unconditional, and have reinforced that declaration by their agreement that the 'absolute and unconditional' nature of their guarantee" was irrespective of the lack of validity of the contract or other circumstance that might constitute a defense). See also FMG, Inc. v. Forest Elec. Corp., 795 F. Supp. 147, 150 (E.D. Pa. 1992)("New York's highest court held that defenses *otherwise available* are barred where the *guarantor* has made its commitment unconditional").

Devon and Itochu vigorously debate whether the merger clauses meet the requisite specificity to conclude as a matter of law that Devon stipulated that the contract superseded any previous representations related to the funding of the robotics device investment venture and whether Plapinger applies given the absence of an explicit waiver of defenses in the present contracts. Yet, we refrain from resolving this dispute. Even if the Court were to allow Devon to introduce its proffered parol evidence, a reasonable fact finder could not conclude that Devon was fraudulently induced into either the Loan & Security Agreement or the Guaranty Agreement.

"To prove fraudulent inducement under New York law, a plaintiff must show: "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the

71

representation, and (iv) the plaintiff suffered damage as a result of such reliance."" MM Arizona Holdings LLC v. Bonanno, 658 F. Supp. 2d 589, 593 (S.D.N.Y. 2009)(quoting Lumbermens Mut. Casualty Ins. Co. v. Darel Group U.S.A. Inc., 253 F. Supp.2d 578, 583 (S.D.N.Y. 2003)); Wells Fargo Bank Northwest N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002)(same elements must be demonstrated whether claim or defense is characterized as fraudulent misrepresentation or fraudulent inducement). "[T]he elements of a fraud claim must be shown by clear and convincing evidence." MM Arizona Holdings, 658 F. Supp. at 593-94 (quoting Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006)). In meeting this burden, Devon "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

As discussed *supra* when applying Pennsylvania law, Devon has not produced evidence that Itochu, or any of its agents, promised to support Devon in additional ways at the time these contracts were signed while knowing that such representations were false statements. See Sabo, 143 N.E.2d at 908 ("mere promissory statements as to what will be done in the future are not actionable" and cannot be the basis for a claim of fraudulent misrepresentation). Furthermore, Devon cannot show that it

72

reasonably relied upon any allegedly false material misrepresentations because it is unreasonable as a matter of law to rely on statements explicitly contradicted by the executed writing. See Robinson v. Deutsche Bank Trust Co., 572 F. Supp. 2d 319, 332 (S.D.N.Y. 2008).

Dr. John Bennett is an experienced businessman who, by his own count, has formed fifty businesses in the span of his career and been personally involved in over a thousand business transactions, including the negotiation of over a hundred contracts. See Dep. of Bennett, Ex. E at 15:18-16:16. Moreover, Bennett had legal representation when he executed these written documents. "Where a written agreement between sophisticated, counseled businessman is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 571 (N.Y. 1986); see Fed. R. Civ. P. 56(e)(2) ("[A]n opposing party may not rely merely on allegations or denials in its own pleadings").

Under the clear and unambiguous terms of the Loan & Security Agreement, and accompanying Promissory Note, Devon Robotics is obligated to repay the $4 million loan, and any outstanding portion of $300,000 down payment Itochu advanced to HRSRL. Likewise, under the clear and unambiguous terms of the Guaranty

Agreement, Devon must repay $5 million to Itochu. Devon's admitted failure to do so amounts to a breach of contract as a matter of law.

### (5) *Impact of DeViedma's Alleged Misconduct*

Finally, Devon Robotics, DHS, and Bennett personally, as Guarantors, claim that they never became obligated under the Guaranty Agreement because HRSRL did not *properly* effect a draw on the $5 million Line of Credit. Allegedly, DeViedma, the principal of HRSRL, served in the dual role of Chief Operating Officer at Devon Robotics. According to Devon, DeViedma breached his fiduciary duty to Devon Robotics when, on behalf of HRSRL, he drew down the Line of Credit, thereby making that draw improper. Devon believes that this erases its obligations under the Guaranty Agreement. We disagree.

The alleged misconduct of HRSRL in drawing down the line of credit is irrelevant to resolving the present claim.[28] Even if HRSRL acted improperly by seeking the $5 million when and how it did, this does not absolve Devon's liability <u>to</u> <u>Itochu</u> under the Guaranty. The contract contains unambiguous language addressing this very situation: "The liability of each of the Guarantors hereunder shall not be limited, released, discharged or in any way affected...by any other act, omission or proceeding in

---

[28] Devon Robotics also initiated a civil action against HRSRL directly in Case No. 09-CV-3552 (E.D. Pa.). While that case was consolidated with the present cases for the purposes of discovery, we address the claims and counterclaims among HRSRL and Devon Robotics in a separate opinion.

relation to this Guaranty Agreement." Ex. C at ¶ 2.8.
Furthermore, the Guaranty Agreement was "absolute, unconditional
and continuing, regardless of the validity, regularity or
enforceability of any of the Guaranteed Amounts." Id. at ¶ 2.5.

Accepting Devon's interpretation of "properly" would
impermissibly defeat the purpose and language of the Guaranty.
Contracts must be read to make the provisions valid. "New York
law clearly 'disfavors interpretations that render contract
provisions meaningless or superfluous." Madeira v. Affordable
Hous. Found., Inc., 323 F. Appx. 89, 91 (2d Cir. 2009)(quoting
Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003)).

In the context of this provision, "properly" plainly means
that the drawdown was executed such that it was accepted by the
bank, $5 million was dispersed from the bank to HRSRL and Itochu
has become "thereby obligated" to pay back the transferred
amount. The parties do not dispute that these logistical steps
were followed, resulting in the dispersal of the $5 million line
of credit to HRSRL. At that point, Devon became obligated to
repay Itochu $5 million and admittedly failed to do so, thereby
breaching its obligations under this contract.

For the reasons outlined above, we grant Itochu's Motion for
Summary Judgment on its claims against Devon for breaching (1)
the $4 million Loan & Security Agreement and (2) the $5 million
Guaranty Agreement.

## III. CLAIMS REGARDING THE ALLEGED BREACHES OF THE MEDSURG DISTRIBUTION AGREEMENT ("MDA")

The MedSurg Distribution Agreement ("MDA"), which MedSurg and Devon Robotics entered into on November 5, 2008, governs the parties' roles in the distribution of the CytoCare medicine preparation robotic device in North America.[29] See Mot. Ex. A.

Devon Robotics claims that MedSurg breached several key provisions in this contract by failing to reimburse Devon Robotics for certain costs and failing to use "reasonable best efforts" in the development and execution of its robotic sales. MedSurg claims that Devon Robotics breached this contract in two ways. First, Devon Robotics refused to pay four commissions on sales of CytoCare robots, totaling $726,510. Second, Devon Robotics refused to reimburse or compensate MedSurg for the $1 million MedSurg paid for two CytoCare inventory units under a contract with Devon Robotics' predecessor in interest, HRNA.

Under Pennsylvania law, "a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract" and he "may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." Ott v. Buehler, 541 A.2d 1143,

---

[29] This contract expressly provides that it is to be governed by the laws of the Commonwealth of Pennsylvania. Ex. A at ¶ 27. Likewise, the other potentially relevant contract, the HRNA-Devon Robotics Settlement Agreement, also expressly provides that any arising disputes concerning its subject matter are to be governed by the laws of the Commonwealth of Pennsylvania. Ex. B, ¶13.

1145 (Pa. Super. 1998); LJL Transp., Inc. v. Pilot Air Freight
Corp., 599 Pa. 546, 560 (Pa. 2009). See also Eastern Elec. Corp.
v. Shoemaker Constr. Co., 657 F. Supp. 2d 545, 557 (E.D. Pa.
2009)("If a breach constitutes a material failure of
performance...the non-breaching party...is discharged from
liability under the contracts that have been breached"). 
Alternatively, if the parties each committed a material breach of
the contract, "the law will give relief to neither party."
Automotive Device Co. v. Automotive Devices Co. of Pa., 292 F.2d
663 (3d Cir. 1961); see also Pure Earth, Inc. v. Call, 2012 U.S.
Dist. LEXIS 38178 at *133-34 (E.D. Pa. Mar. 21, 2012); Cottman
Transmission Systems, Inc. v. Dubinsky, 550 F. Supp. 133, 136
(E.D. Pa. 1982).

    What a written contract requires of the parties is a
question of law when the contract language is clear and
unequivocal. Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619
F.2d 1001, 1010 (3d Cir. 1980); see also Kroblin Refrigerated
Xpress, Inc. v. Pitterich, 805 F.2d 96, 102 (3d Cir. 1986)
(deciding whether the terms are clear and unambiguous is a task
for the Court). Whether a breach of contract constitutes a
material breach is a question of fact. Hartman Plastics v. Star
Int'l Ltd., 1998 U.S. Dist. LEXIS 417 (E.D. Pa. Jan. 21, 1998);
Forest City Grant Liberty Associates v. Genro II, Inc., 652 A.2d
948, 951 (Pa. Super. 1995).

These claims teeter on a mountain of disputed, material facts. As such, summary judgment in favor of either party is inappropriate. For this same reason, the Court must deny Itochu's motion for summary judgment in its own defense against Devon's claim for this same alleged breach against Itochu directly.[30] However, we endeavor to clarify the parties' obligations under the plain language of the contract, wherever possible, before the case proceeds to trial.

**(1) Reimbursement for "Marketing Expenses"**

Devon Robotics argues that MedSurg failed to pay certain marketing expenses in violation of Section 3. MedSurg claims that it is not responsible to pay these invoiced expenses under the plain language of the contract. Nothing in Section 3, nor any other more specific enumeration of the parties' obligations, imposes such an obligation.

Section 3 of the MDA, titled "Overview of the Responsibilities of the Parties," provides in full:

> Devon Robotics and [MedSurg] agree that it is their intention to engage in a collaborative effort with regard to the sale of [CytoCare] and that they share responsibility for the overall creative marketing strategy, including branding, image and market position, pricing and non-binding sales objectives. [MedSurg] is solely responsible for implementing and executing this strategy in the market, and Devon Robotics has oversight responsibility with respect to this strategy. Devon Robotics also has responsibility for management and implementation of maintenance and service of [CytoCare].

---

[30] While Itochu was not a party to the MDA, Devon has maintained, and we have agreed, that there is sufficient evidence that Itochu is liable for the actions of its subsidiary under a corporate veil piercing theory.

Under this provision, MedSurg and Devon Robotics are both responsible for the creative marketing strategy, but MedSurg alone is responsible for its implementation and execution in the market. It is unclear whether MedSurg is obligated to reimburse the marketing expenditures Devon Robotics seeks to recoup.[31]

**(2) "Reasonable Best Efforts"**

Devon Robotics claims that MedSurg did not use "reasonable best efforts" to promote and to ensure the sale of the CytoCare robot in violation of §§ 11.1-11.4. This assertion rests almost entirely on contested facts and the interpretation of ambiguous contract language.

However, MedSurg's failure to perform under § 11.3, one of many issues in the dispute over "reasonable best efforts," can be resolved as a matter of law given the plain language of the provision. § 11.3 states:

> No later than December 31, 2008, establish a sales team consisting initially and minimally of six salespeople, two individuals in a clinical sales support and business development role (of which one must be a pharmacist), and one sales manager; all dedicated exclusively to the marketing, sales and licensing of the Product.

Defendants maintain that they met the requirements by hiring six salespeople, two of whom served the dual roles of clinical sales

---

[31] We agree with MedSurg that Devon Robotics must demonstrate that it actually spent the invoiced amounts on marketing CytoCare to succeed in a claim against MedSurg for failure to pay the listed marketing expenses even if it is established that MedSurg is responsible for reimbursing these costs. The validity of Devon Robotics' invoices is a matter of fact currently in dispute.

support and business development.[32] But, we agree with Plaintiffs that this provision required MedSurg to hire and maintain a staff of at least nine individuals. First, the comma after "six salespeople" makes this requirement one more in the list of requirements, *not* a whole to be subsequently delineated with further detail. Second, the provision uses "of which" only following the listed two individuals who will service in a clinical sales support and business development role.

Nevertheless, there remains a genuine factual dispute as to whether MedSurg's cumulative efforts fell short of "reasonable best efforts."

**(3) Payment for Brigham & Women's Hospital Clinical Trial**

Devon Robotics asserts that MedSurg failed to pay $61,924.50 owed to Brigham & Women's Hospital under the clinical trial agreement executed on March 17, 2009. MedSurg maintains that the clinical trial agreement was formed close to the end of the MDA, and that MedSurg knew at that point that the obligation was a nullity so did not proceed to meet it. Moreover, MedSurg argues that there was no direct damage from its failure to pay; even if this was a breach of contract, it was not a material breach. The issue of materiality is one for a jury.

---

[32] One month into the MDA, MedSurg had hired six individuals to work in sales: Craig Tabackin, Katie Kimura, Mitch Bowman, Shawn Riley, Dan Finley, and Peter Camp. Two of these individuals–Finley and Camp–also served in a clinical sales support and business development role; Finley was a pharmacist. In addition, MedSurg employed Will Rutan as a sales manager.

**(4) Payment of Commissions to MedSurg**

**(a) *Existing Contracts under Schedule 1***

Under the MDA, Devon Robotics agreed to pay a fixed one-time commission of $160,000 for each of five pre-existing customer contracts if those contracts went into effect on or prior to November 5, 2008. See ¶ 7; Ex. D, Schedule 1. Each of these contracts was executed prior to November 5, 2008 and deemed accepted by Devon Robotics. See "Existing Accepted Customer Contracts" Ex. C.

MedSurg claims that Devon Robotics breached its duty by failing to pay MedSurg commission on three of these contracts: (1) University of Michigan Comprehensive Cancer Care Center, (2) University of Pennsylvania Cancer Center, and (3) Barbara Ann Karmanos Cancer Institute. We agree that by the unambiguous language of the MDA, Medsurg was entitled to commission on all three of these customer contracts, for a total owed of $480,000.

Devon Robotics' only response is that it is excused from these contractual obligations because MedSurg materially breached the MDA. MedSurg acknowledges that a material breach is an "event of default" under the contract, and termination of the contract is the primary and appropriate remedy when a material breach occurs. See ¶¶ 1.2-1.3. MedSurg also correctly points out that termination of the contract did not extinguish the existing debt

owed to it by Devon Robotics. See ¶ 24.[33] But, if MedSurg
materially breached the contract, *that* breach, and not Devon's
actions to remedy it through proper termination, may extinguish
Devon Robotics' liability for these commissions. See ¶ 1.3.
Genuine issues of fact exist as to whether MedSurg's breach, if
any, was material, and thereby relieved Devon Robotics of its
obligation to pay MedSurg these commissions.

### (b) W.A. Foote Memorial Hospital (d/b/a Allegiance Health)

MedSurg claims that Devon Robotics has failed to pay
$246,510 in commission owed for the Allegiance Health contract,
which falls under Schedule 2 for determination of the commission
rate.[34] The contract defines "Accepted Customer Contracts" as
those "Customer Contract[s] between the customer and Devon
Robotics [that have] been fully executed by the Customer and by
Devon Robotics, and which include[] all aspects of the
transaction, including the base price for the Product,
installation fees, maintenance fees, and any other fees within
the initial term of [these] contract[s]." ¶ 7.1. By the terms of

---

[33] MedSurg asserts that the commissions "became due six months" before the
contract was terminated. Reply at 2. We cannot ascertain the veracity of this
statement based on the record before us. Given the contract's construction,
MedSurg was entitled to a commission at the time of the execution of the sale.
However, payment of these commissions did not become due at that instant. But,
it is possible that payment had not come due by time of MedSurg's alleged
material breach and the subsequent termination of the contract by Devon.

[34] The TCV includes a base unit price of $645,000, Ex. I at 13, ¶ 1,
installation fees of $70,000, Id. at 19, ¶ 5, and service fees of $3,300 a
month for 60 months, Id. at ¶¶ 1, 4, for a total of $913,000. The parties
agreed to a 27% commission on the Allegiance Health contract, which amounts to
$246,510. Ex. J.

the contract, sales are confirmed only at this point. Under the "Commission Payment Terms," Devon Robotics must "pay or entitle the proper amount of commission upon execution of the sales contract..." Contract, Ex. D. Payment itself must be made "no later than 30 days after technical installation, customer acceptance and first payment by Customer." Id.

Devon Robotics insists that it never received payment on this contract, and that it wasn't required to pay a commission to MedSurg until that occurred. "Because Devon Robotics never received any payment under the Allegiance Agreement, the conditions precedent to *entitle* MedSurg to a commission were never met." Resp. at 11 (emphasis added). But, by the unambiguous terms of the contract, MedSurg is entitled to a commission "upon execution of the sales contract."[35]

Based on the parties' representations, Devon Robotics terminated the MDA because of MedSurg's alleged material breach and before Allegiance made its first payment. Whether Devon Robotics can be held to its contractual obligation to pay the entitled commission on the Allegiance contract, which had not come due by the time of the alleged material breach by MedSurg,

---

[35] Devon Robotics presents the Allegiance Agreement as evidence. Both parties recognize that the effective date of the contract has been deleted. However, the opening paragraph states "As of December 15, 2008" and the contract was signed by Joe Santoro who left Devon Robotics' employ before the MDA was terminated in April 2009. Thus, it is uncontested that this contract was signed by that time. See Opp. Br. at 7, n.16; see also Email from O'Connell to Santoro (Dec. 31, 2008), Ex. O (MedSurg "need[s] to recognize Allegiance at total TCV for 2008. We do not expect to collect on the revenue until the deal comes to close etc.")

requires the resolution of factual disputes, discussed *supra*, and
is properly reserved for the jury.

**(5) Compensation for Two Pre-Paid CytoCare Units**

While engaged in a previous distribution contract with HRNA,
MedSurg paid $1 million for two CytoCare inventory units. MedSurg
claims that Devon Robotics now owes MedSurg $1 million for these
two units.[36]

It is disputed whether Devon Robotics assumed a financial
obligation to MedSurg for the two CytoCare inventory units when
Devon Robotics entered into the October 31, 2008 Settlement
Agreement with HRNA. As MedSurg points out, Schedule 2, the "List
of Past Due HRNA/HRLLC Obligation," lists "Prepaid [CytoCare]
Inventory Unit #1" and "Prepaid [CytoCare] Inventory Unit #2"
alongside the name MedSurg. However, MedSurg neglects to
acknowledge that next to each of these items, Schedule 2 lists an
amount owed: €0. Moreover, MedSurg's initial contract with HRNA
does not unambiguously guarantee reimbursement. See Resp. at 3-4,
Doc. No. 82. Arguably, Devon Robotics did not assume *any* debt to
MedSurg for these robotic units.

---

[36] MedSurg seems to insinuate that Devon Robotics has failed to deliver, taken
control of, or stolen these two CytoCare robot units. However, we see no clear
evidence of this in the record. These two robot units have somehow escaped
MedSurg's possession and their whereabouts remain unknown. O'Connell, the
President of MedSurg, testified that neither he nor anyone else at MedSurg
knows where these units are, and that MedSurg does not have the units in its
inventory or possession. Dep. of O'Connell, Mot. Ex. E at 140:7-141:9.

It is clear, as a matter of law, that Devon Robotics is not contractually obligated to compensate MedSurg for the two prepaid units MedSurg purchased from HRNA under the terms of the MDA. This contract between MedSurg and Devon Robotics contains a section titled "Compensation to Distributor for Sales of The First Two (2) Units Of The Product," which states:

> Pursuant to the Distribution Agreement between Distributor [MedSurg] and Health Robotics, LLC [HRNA/HRLLC] dated June 10, 2008, Distributor purchased from Health Robotics, LLC two (2) units of the Product. Devon Robotics agrees that the first two (2) units of the Product sold by the Distributor pursuant to this Agreement shall result in compensation to Distributor in an amount determined by the following formula: Devon Robotics will pay to Distributor the Total Contract Value (TCV) less installation fees, maintenance fees, delivery charges, taxes, and costs of shipping. ¶ 8

This provision is unambiguous: Devon Robotics was only obligated to compensate MedSurg *after* MedSurg sold the two units.

MedSurg, acknowledging that it never sold these units, claims that Devon Robotics still must reimburse the $1 million because Devon Robotics knowingly acted to deprive MedSurg of the opportunity to sell the pre-paid units when Devon Robotics unilaterally terminated the MDA on April 29, 2009. Whether this is true, and if so, whether it amounts to a breach of contract are questions of fact for the jury.

For the above reasons, we deny MedSurg's Motion for Summary Judgment on Devon Robotics' breach of contract claim, deny MedSurgs' Motion for Summary Judgment on its counterclaim against

Devon Robotics for breach of contract, and deny Itochu's Motion for Summary Judgment as to Count II.

## CONCLUSION

Following a thorough analysis of the record and arguments in these consolidated case, and for the foregoing reasons, we grant Itochu's Motion for Summary Judgment in Case No. 09-CV-1819 with respect to Count III for Fraudulent Misrepresentation, Count V for Breach of Duty to Negotiate in Good Faith, Counts VI and VII for Breach of Oral Contract, and Counts VIII and IX for Promissory Estoppel. We also grant Itochu's Motion for Summary Judgment on its claims against Devon in Case No. 09-CV-4123 for Breach of Contract.

However, given the genuine disputes over material facts regarding performance under the MDA, and Itochu's possible liability under a corporate veil piercing theory, we deny Itochu's Motion for Summary Judgment with respect to Count II for Breach of Contract. For the same reason, we deny both MedSurg's Motion for Summary Judgment on this claim and MedSurg's Motion for Summary Judgment on its counterclaim against Devon Robotics for breach of the MDA.

An order follows.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN A. BENNETT, M.D.,        :

ET AL.,                       :

       Plaintiffs,        :    CIVIL ACTION

        v.               :    NO. 09-CV-1819

ITOCHU INTERNATIONAL INC.,    :

ET AL.,                       :    CONSOLIDATED WITH

       Defendants.        :    NO. 09-CV-4123

**ORDER**

AND NOW, this 23rd day of August, 2012, upon consideration
of Defendants Itochu International Inc. ("Itochu"), et al.'s
Motion for Summary Judgment (Doc. No. 80), Plaintiffs' Response
in opposition thereto (Doc. No. 84; Doc. No. 39 in Case No. 09-
CV-4123), and Defendants' Reply (Doc. No. 86; Doc. No. 41 in Case
No. 09-CV-4123) in Case No. 09-CV-1819; Defendant/ Counter-
Claimant MedSurg Specialty Devices, Inc.'s ("MedSurg") Motion for
Summary Judgment (Doc. No. 79), Plaintiff/Counter-Defendant Devon
Robotics, LLC's ("Devon Robotics") Response in opposition thereto
(Doc. No. 82; Doc. No. 37 in Case No. 09-CV-4123), and MedSurg's
Reply (Doc. No. 87; Doc. No. 42 in Case No. 4123) in Case No. 09-
CV-1819; and, Plaintiff Itochu's Motion for Summary Judgment

87

(Doc. No. 34; Doc. No 81 in Case No. 09-CV-1819), Defendants Devon Robotics, <u>et</u> <u>al</u>.'s Response in opposition thereto (Doc. No. 38; Doc. No. 83 in Case No. 09-CV-1819), and Plaintiff's Reply (Doc. No. 40; Doc. No. 85 in Case No. 09-CV-1819) in the consolidated Case No. 09-CV-4123, it is hereby ORDERED that:

(1)   Defendants Itochu International Inc., <u>et</u> <u>al</u>.'s Motion for Summary Judgment (Doc. No. 80) is DENIED as to Count II for Breach of Contract against Defendants Itochu and MedSurg. The Motion is GRANTED as to all other remaining counts.

(2) Defendant/Counter-Claimant MedSurg Specialty Devices, Inc.'s Motion for Summary Judgment (Doc. No. 79) is DENIED.

(3) Plaintiff Itochu International's Motion for Summary Judgment (Doc. No. 81; Doc. No. 34 in Case No. 09-CV-4123) is GRANTED.

                              BY THE COURT:


                              <u>s/J. Curtis Joyner</u>
                              J. CURTIS JOYNER, C.J.